UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANTOINETTE LAFONTANT,

                              Plaintiff,                          No. 18-CV-23 (KMK)

              v.                                                OPINION & ORDER

JAMES NEALE; STACEY
SCHOONEMAKER; and MID-HUDSON
FORENSIC PSYCHIATRIC CENTER,

                              Defendants.

---

Appearances:

Michael B. Ranis, Esq.
Goshen, NY
*Counsel for Plaintiff*

Matthew J. Lawson, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Antoinette LaFontant ("Plaintiff") brings this Action against Mid-Hudson Forensic

Psychiatric Center ("Mid-Hudson"), James Neale ("Neale"), and Stacey Schoonemaker

("Schoonemaker") (collectively, "Defendants"), alleging that Defendants maintained a hostile

work environment and retaliated against her on the basis of her national origin and sex, in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Equal

Protection Clause of the Fourteenth Amendment. (Second Am. Compl. ("SAC") (Dkt. No. 35).)

Before the Court is Defendants' Motion To Dismiss (the "Motion"). (Not. of Mot. (Dkt. No.

36).) For the reasons set forth herein, the Motion is granted in part and denied in part.

## I.  Background

### A.  Factual History

The following facts are drawn from Plaintiff's Second Amended Complaint and are taken as true for the purpose of resolving the instant Motion.

Plaintiff — who is a black "woman of West Indian descent, who was born [in] and immigrated from Haiti" — began working at Mid-Hudson as a Security Hospital Treatment Assistant ("SHTA") in February 2013.  (SAC ¶¶ 16–17.)  The function of an SHTA is to "provid[e] security, treatment, and nursing aide to patients."  (*Id.* ¶ 16.)  SHTAs sometimes work overnight shifts.  (*Id.* ¶ 19.)  During these overnight shifts, Plaintiff would "bring[] hot food to help feed other co-workers" because she "considered the sharing of a home-cooked meal as a sign of friendship"; "[i]n [Plaintiff's] Haitian culture and historical tradition, this was a common practice of bonding together and sharing . . . even when working in a difficult and stressful environment."  (*Id.*)

In March 2015, Defendant Schoonemaker, another SHTA, telephoned Plaintiff on a Sunday and asked her "if she knew what type of food" Cadet (first name unidentified) — a male SHTA of Haitian descent who was (or had been) in a romantic relationship with Schoonemaker — liked.  (*Id.* ¶¶ 3, 20.)  Plaintiff answered, but Schoonemaker replied by stating, "'I'm warning you, stay away from him and don't bring him food anymore."  (*Id.* ¶ 21.)  Plaintiff thereafter told Cadet about this interaction with Schoonemaker; Cadet told Plaintiff "not to 'pay' Schoonemaker or her threats any mind, nor to worry."  (*Id.* ¶ 22.)

On March 26, 2015, Plaintiff and Schoonemaker were working the same shift and location.  (*Id.* ¶ 23.)  Plaintiff had brought Cadet (and other co-workers) food, thereby causing Schoonemaker to "bec[ome] enraged," to "accuse[] [Plaintiff] of 'sleeping with her man,'" and

to "threaten[] to hurt [Plaintiff] if she cooked for or made further efforts to 'steal' her man." (*Id.*) Plaintiff responded to Schoonemaker that she had a "cultural practice of providing food to co-workers and friends." (*Id.* ¶ 24.) However, Schoonemaker replied that, "'if you are feeding him, you are sleeping with him.'" (*Id.*)

Plaintiff complained to (unidentified) supervisors at Mid-Hudson, but they "declined to get involved." (*Id.*)

Throughout spring 2015, Schoonemaker's verbal harassment of Plaintiff continued. (*Id.* ¶ 25.) In particular, Schoonemaker told (unidentified) "others that 'this bitch [Plaintiff] brings food and wants to get people on her side,'" and that Plaintiff was "trying to dominate people with food." (*Id.*) Further, Schoonemaker — along with her "African-American and Hispanic co-workers" — repeatedly referred to Plaintiff as the "Haitian girl," refusing to identify her by name. (*Id.* ¶¶ 26–27.) Schoonemaker and others would also "repeatedly" tell Plaintiff "that she must mistakenly think that she was 'back home' in Haiti — thus referring disparagingly to [Plaintiff] having no power as an outsider Haitian woman." (*Id.* ¶ 27.) Finally, Schoonemaker's friends "rallied around Schoonemaker and threatened [Plaintiff] if she made further efforts to provide food or friendship to Schoonemaker's boyfriend, Cadet." (*Id.* ¶ 30.)

In April 2015, Schoonemaker telephoned Plaintiff multiple times to state that she "promised to make [Plaintiff's] 'life a living hell.'" (*Id.* ¶ 28.)[1] In May 2015, Schoonemaker "physically pushed [Plaintiff] in a line-up before the start of work, almost causing her to fall." (*Id.* ¶ 29.) Plaintiff reported this incident, along with the repeated name-calling, to various supervisor SHTAs, including Jerry Thomas, Yvonne Cooper, and Lisa Rivera, none of whom

---

[1] Plaintiff alleges that, in April 2015, the engine in her car malfunctioned due to "someone [having] placed a large quantity of sugar in her gas tank." (SAC ¶ 28.) Plaintiff does not appear to allege, however, that Schoonemaker (or any other Defendant) was responsible.

meaningfully acted.  (*Id.*)

In June 2015, Schoonemaker telephoned Plaintiff again and told "her not to mention her name and threaten[ed] to follow her to the parking lot at work and 'beat her up,' and to 'follow [Plaintiff] to [her] home, and beat [her] child's ass.'"  (*Id.* ¶ 31.)  Schoonemaker further threatened Plaintiff that she would "come at [her] with a knife in the parking lot," that "she had been working for the State for many years, so she knows 'what to do' and how to create 'trouble' for [Plaintiff] in her job with [Mid-Hudson]."  (*Id.*)

On June 8, 2015, Plaintiff complained to James Parker ("Parker"), the evening SHTA supervisor, regarding Schoonemaker.  (*Id.*)  Parker told her "that he would look into the issue."  (*Id.*)  However, Parker later informed Plaintiff "that he would not protect her, and that it 'was out of his hands' and [that] she 'should do whatever she can to protect herself.'"  (*Id.* ¶ 33.)  Further, Parker "advised that [Plaintiff] had better listen to the co-workers and *stay away from any of the male employees* as instructed."  (*Id.* (emphasis in original).)

On June 9, 2015, Plaintiff "visited the local police department" and "file[d] a complaint" about Schoonemaker's harassment and threats.  (*Id.* ¶ 34.)

Sometime in the summer of 2015, Plaintiff took an unpaid temporary medical leave of absence at the recommendation of Mid-Hudson personnel office supervisors Patti Greenwood and Lisa Hendrickson.  (*Id.* ¶¶ 35–36.)  On the second day of her leave, Fabiola Garcon ("Garcon"), a friend of Schoonemaker's and a "Black woman of Haitian descent," texted Plaintiff "more than a dozen graphic sexual images of Garcon performing oral sex with a man" and further "derided [Plaintiff's] sexuality . . . , claiming that it was this activity that 'she had been missing.'"  (*Id.* ¶ 37.)  Garcon also "threatened that such sexual activity was impossible or forbidden for [Plaintiff] as a woman because of the threats and orders from [Schoonemaker] and

the other co-workers." (*Id.* ¶ 38.)  According to Plaintiff, "Garcon thus implied that [Plaintiff] had both been an overly sexualized woman in the past, and clearly wasn't a real woman anymore given her co-workers['] instructions and threats." (*Id.*)  Plaintiff thereafter learned from another SHTA, Michelle Campbell, that Schoonemaker "review[ed] the photos with Garcon[] and decid[ed] how to humiliate [Plaintiff] with the sexual images and their stereotypical view of [Plaintiff's] sexuality and activity." (*Id.* ¶ 37.)

Plaintiff complained to James Neale ("Neale") — Mid-Hudson's Chief of Staff Operations and its "highest ranking day-to-day manager" — and showed him the graphic photographs. (*Id.* ¶¶ 8, 39–40.)  Plaintiff told Neale that she was considering resigning due to the pressure, but Neale told her not to quit. (*Id.*)  Neale further told Plaintiff "to erase the photos" and to "'just ignore' the messages and images." (*Id.*)  Plaintiff was later told by Hakim Peterson ("Peterson"), another SHTA, that Neale had told Peterson "that because [Plaintiff] had reported the physical harassment to the police 'outside' the world of [Mid-Hudson], she was now an '*enemy of the State*' and would be treated accordingly." (*Id.* ¶ 41 (emphasis in original).)

On August 3, 2015, Plaintiff returned from her unpaid medical leave. (*Id.* ¶ 42.)  On September 15, 2015, Plaintiff spoke with Jose Segarra ("Segarra"), an Assistant Director at Mid-Hudson, and "informed him about the harassment and retaliation." (*Id.*)  Although Segarra stated that he would "get back to [Plaintiff] in a week" after "review[ing] the complaints," he "never did inform her of any action or resolution." (*Id.*)

On November 9, 2015, Oneida Musa ("Musa") and Vernice Horne ("Horne") — two SHTAs who were friends with Schoonemaker — "falsely accused [Plaintiff] of mishandling a patient and pinching or slapping the patient's arm while the nurses were drawing blood." (*Id.* ¶¶ 43–44, 57.)  Plaintiff alleges that Musa and Horne "manufactured the false criticisms in order

to retaliate against [Plaintiff] for her complaints to the police and to the other supervisors." (*Id.* ¶ 44.) Plaintiff further alleges that, given her numerous complaints to supervisors, Mid-Hudson and Neale "well understood" the false and retaliatory nature of the allegations. (*Id.* ¶ 45.) Further, Christine Thorne ("Thorne"), a Mid-Hudson "weekend supervisor," told Plaintiff that she knew the allegations were not true and that Plaintiff was "'not capable' of treating a patient that way." (*Id.* ¶ 46.) Nevertheless, Mid-Hudson "began the procedures for disciplining" Plaintiff and ultimately suspended Plaintiff in February 2016. (*Id.* ¶¶ 44–47.)

While Plaintiff was suspended, Garcon texted Plaintiff a video of herself, in which she stated, "'Ah, karma is a bitch, that's what you get for sleeping with someone else's man.'" (*Id.* ¶ 48.)

Plaintiff returned from her suspension in April 2016. (*Id.* ¶ 49.) In summer 2016, Sharon Clarke ("Clarke"), another SHTA, told Plaintiff to "leave Cadet alone and stop feeding him." (*Id.* ¶ 50.) In October 2016, Garcon told Plaintiff "that some people can't 'take the heat,'" and that "'[Garcon] can be a bitch and make [people] hurt themselves for real this time.'" (*Id.* ¶ 52.) Garcon further stated that she would "'keep helping [Plaintiff] to best handle the pressure by killing [herself]'" and that she was "going to make [her] do it.'" (*Id.*) In November 2016, Brown (first name unidentified), a supervisor SHTA, told Plaintiff that he would fire her for "anything that [she does] on the overnight shift." (*Id.* ¶ 53.) Brown further asked Plaintiff "how Cadet was doing" and "'[h]ow's your man?'" (*Id.* ¶¶ 54–56.) Brown also stated that he "would send Cadet and [Plaintiff] a nice present on their wedding day" and called Plaintiff "Mrs. Cadet." (*Id.*) Finally, Brown repeatedly called Plaintiff "fart-face." (*Id.* ¶ 55.)

In December 2017, Musa and Horne — the SHTAs who allegedly had earlier falsely accused Plaintiff of patient abuse — "falsely accused [Plaintiff] of practicing witchcraft and

performing 'voodoo' while at work" and of "lighting candles and depositing skeletons in Musa's car." (*Id.* ¶ 57.) Mid-Hudson investigated these allegations and did not discipline Plaintiff. (*Id.*)

Beginning in late 2017 and continuing through 2018, Clara Simms ("Simms") — a supervisor SHTA who is friends with and worked with Schoonemaker — assigned Plaintiff to monitor a particular male patient who repeatedly "sexually expose[d] himself during masturbation in [Plaintiff's] presence." (*Id.* ¶¶ 59–61.) This was contrary to Mid-Hudson policy, which "prohibits subjecting a female SHTA to highly sexualized environment[s]." (*Id.* ¶ 64.) Plaintiff repeatedly complained to Simms and others, yet Simms refused to re-assign Plaintiff. (*Id.* ¶¶ 63, 66.)

In sum, Plaintiff alleges that Defendants — Mid-Hudson, Neale, and Schoonemaker — engaged in

> stereotypical thought applied to a woman who offers caring and camaraderie to a
> co-worker. Women must be sexualized and desirous of stealing a man for a
> romantic relationship. Such is only truer when the woman [is] West Indian or
> Haitian, indicating 'intersectional' discrimination . . . .

(*Id.* ¶ 51.) Plaintiff further alleges that Mid-Hudson "failed to take any appropriate corrective action" in response to the repeated harassment, threats, and retaliation, and instead "allow[ed] the sexually harassing and retaliatory environment to exist on a daily basis." (*Id.* ¶ 69.)

B. Procedural History

Plaintiff filed her initial Complaint on January 2, 2018. (Dkt. No. 1.) On May 1, 2018, Defendants filed a letter seeking a conference in anticipation of moving to dismiss. (Dkt. No. 23.) Plaintiff filed a responsive letter on May 4, 2018. (Dkt. No. 24.) The Court held a pre-motion conference on June 7, 2018, after which Plaintiff filed a First Amended Complaint. (First Am. Compl. (Dkt. No. 30).) Plaintiff filed the instant Second Amended Complaint on September 27, 2018. (SAC (Dkt. No. 35).) On October 18, 2018, Defendants filed their Motion

To Dismiss and accompanying papers.  (Not. of Mot.; Defs.' Mem. of Law in Supp. of Mot.

("Defs.' Mem.") (Dkt. No. 37); Decl. of Matthew J. Lawson, Esq. in Supp. of Mot. ("Defs.'

Decl.") (Dkt. No. 38).)  Plaintiff filed a response in opposition to the Motion on November 16,

2018.  (Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 39).)  On December 7,

2018, Defendants filed a reply.  (Defs.' Reply Mem. of Law in Further Supp. of Mot. ("Defs.'

Reply") (Dkt. No. 40).)

## II. Discussion

Defendants move for partial dismissal of the Second Amended Complaint pursuant to

Federal Rule of Civil Procedure 12(b)(6).  As to Plaintiff's Title VII retaliation claim,

Defendants argue that certain allegations are time-barred and that the surviving allegations fail to

allege a plausible causal nexus between Plaintiff's complaints of harassment and the alleged

retaliatory acts.  (Defs.' Mem. 5–11.)  As to Plaintiff's Title VII hostile work environment claim,

Defendants similarly argue that certain allegations are time-barred; however, Defendants do not

seek dismissal of the timely allegations.  (*Id.*)  As to Plaintiff's equal protection claims,

Defendants argue that Plaintiff fails to establish that Schoonemaker acted under color of state

law or that Neale acted with discriminatory intent.  (*Id.* at 11–19.)  The Court addresses each

argument separately to the extent necessary.

### A.  Standard of Review

The Supreme Court has held that, while a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(citations, quotation marks, and alterations omitted).  Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d

302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Finally, the Court "must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted).

B.  Analysis

1.  Title VII Time-Barred Allegations

"Before an aggrieved party can assert a Title VII claim in federal court, [she] is generally required to . . . file a charge of discrimination with the EEOC within three hundred days after the alleged unlawful employment practice occurred, and must then file an action in federal court within 90 days of receiving a right-to-sue letter from the agency." *Duplan v. City of New York*, 888 F.3d 612, 621–22 (2d Cir. 2018) (quotation marks omitted) (citing 42 U.S.C. §§ 2000e-5(e)(1), (f)(1)).

Defendants argue that Plaintiff's Title VII allegations as to Defendants' actions in 2015 and 2016 are time-barred under both the 300-day rule and the 90-day rule. (Defs.' Mem. 5.) In response, Plaintiff argues that, under the "continuing violation" exception to the 300-day rule, the 2015 and 2016 allegations may be considered alongside the (undisputedly timely) 2017 allegations because they are part of a continuing practice of discrimination and retaliation. (Pl.'s Mem. 3.) *See Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (describing continuing violation exception). The Court need not resolve this question, for even assuming the 2015 and 2016 allegations are timely under the continuing violation exception, they are nevertheless time-barred under the 90-day rule.

The relevant procedural history is as follows. Plaintiff filed her first EEOC charge of

discrimination on September 5, 2017.  (*See* Defs.' Decl. Ex. B.)  In that EEOC charge, Plaintiff

alleged that she was subjected to discrimination, retaliation, and a hostile work environment at

Mid-Hudson between March 2015 through June 2017.  (*See generally id.*)  The EEOC sent

Plaintiff a right-to-sue letter on December 1, 2017, (*id.* Ex. C), which Plaintiff received on

December 4, 2017.[2]  Plaintiff brought suit on January 2, 2018, but the initial Complaint did *not*

bring a claim under Title VII.  (*See* Compl. ¶¶ 60–72 (claim under § 1983); *id.* ¶¶ 72–77 (claim

under New York state law).)  Plaintiff filed a second EEOC charge on March 20, 2018 raising

allegations of hostile work environment and retaliation after December 2017, (*see* Defs.' Decl.

Ex. D), and received a second right-to-sue letter on June 25, 2018, (*id.* Ex. E).  Plaintiff then

filed her First Amended Complaint — raising, for the first time, a claim under Title VII — on

July 17, 2018, some 225 days after receiving the first right-to-sue letter and 22 days after

receiving the second right-to-sue letter.  (*See* First Am. Compl. ¶¶ 65–74.)

Therefore, under the 90-day rule, although Plaintiff's Title VII claim was timely with

respect to the second EEOC right-to-sue letter, it was not timely with respect to the first EEOC

right-to-sue letter.  The remaining question is whether the continuing violations exception

applies.  The Second Circuit has "not decided whether the continuing violation theory can revive

claims that are time-barred" under the 90-day rule.  *Serrano v. N.Y. State Dep't of Env. Conserv.*,

714 F. App'x 90, 92 (2d Cir. 2018).  However, every district court in the Second Circuit to have

considered the issue has held that the 90-day rule does not contain a continuing violation

exception.  *See Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 207 (E.D.N.Y. 2014)

---

[2] An EEOC right-to-sue letter is presumed received "three days after its mailing."
*Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525–26 (2d Cir. 1996).  This presumption is
rebuttable, *id.*, but Plaintiff does not allege that she did not receive the letter or that it arrived at a
later time.

(collecting cases from the First, Sixth, Seventh, and Tenth Circuits and holding that "a plaintiff may not rely on the continuing violation theory to revive time-barred claims" under the 90-day rule); *see also Serrano v. N.Y. State Dep't of Env. Conserv.*, No. 12-CV-1592, 2017 WL 1194238, at *2 (N.D.N.Y. Mar. 30, 2017) ("[W]hile the continuing violation doctrine may toll the statutory period within which a claimant must file a complaint with the EEOC, it does not eliminate the requirement that a claimant must file her complaint in court within ninety days of receiving a right-to-sue letter." (citing, inter alia, *Bowen-Hooks*)); *Torregiano v. Monroe Cmty. Coll.*, No. 11-CV-6300, 2015 WL 6641784, at *10 (W.D.N.Y. Oct. 28, 2015) (same); *Cloward v. Columbia Univ.*, 888 F. Supp. 21, 23–24 (S.D.N.Y. 1995) (rejecting application of continuing violation exception to the analogous 90-day rule under the Age Discrimination in Employment Act).[3] These decisions are sensible: although the continuing violation exception to the 300-day rule — that is, the requirement that a claim be filed with the EEOC within 300 days — is designed to avoid the inequitable result "that meritorious discrimination claims are [barred] because the claimant needed to experience a pattern of repeated acts before she could be expected to realize that the individual acts were discriminatory in nature," *Loubriel v. Fondo del Seguro del Estado*, 694 F.3d 139, 144 (1st Cir. 2012) (citation omitted), the requirement that suit be initiated within 90 days following the receipt of the EEOC's right-to-sue letter engenders no similar concern, for "[b]y the time [the claimant] receives a right-to-sue notice, [the] claimant is necessarily aware of the defendant's discriminatory conduct," *id.* This Court therefore joins those courts holding that the 90-day rule encompasses no continuing violation exception.

Accordingly, Plaintiff's "claims based on facts that formed the basis of the first right-to-

---

[3] Plaintiff does not identify any case, whether in the Second Circuit or outside of it, in which a court held or suggested that the 90-day rule contains a continuing violation exception.

sue letter" — that is, those allegations as to Defendants' actions between March 2015 and June 2017 — are time-barred. *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 370 (S.D.N.Y. 2006); *see also Pertillar v. AAA W. & Cent. New York*, No. 16-CV-238, 2018 WL 583115, at *3 (N.D.N.Y. Jan. 26, 2018) ("[U]nder Title VII, to the extent that [the plaintiff's] claims in the instant suit are based on the same facts as those contained in his first two EEOC charges — charges for which he received right to sue notices but failed to timely commence a suit — those claims are time-barred." (citations omitted)); *Bowen-Hooks*, 13 F. Supp. 3d at 207 (holding time-barred those Title VII claims in which the plaintiff "opted not to act within 90 days of her 2006 EEOC right-to-sue letter").[4]

### 2. Title VII Retaliation Claim

"To establish a presumption of retaliation at the initial stage of a Title VII litigation, a plaintiff must present evidence that shows (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 315–16 (2d Cir. 2015) (quotation marks omitted). "[T]he

---

[4] Plaintiff does not argue for equitable tolling. In any event, "equitable tolling is only appropriate in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising [her] rights." *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (citations, alterations, and quotation marks omitted). "When determining whether equitable tolling is applicable, a district court must consider whether the person . . . (1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Id.* at 80–81 (quotation marks omitted). "[T]he second prong . . . is met only where the circumstances that caused a litigant's delay are both extraordinary *and* beyond its control." *Menominee Indian Tribe of Wisconsin v. United States*, 136 S. Ct. 750, 756 (2016). Here, equitable tolling is not warranted because Plaintiff has not shown (or even alleged) that she acted with reasonable diligence and that she was delayed due to extraordinary circumstances beyond her control. *See Ziyan Shi v. N.Y. Dep't of State*, No. 18-CV-3455, 2019 WL 1570733, at *8 (S.D.N.Y. Apr. 11, 2019) (declining to equitably toll Title VII claim where counsel "misapprehended the date by which the [c]omplaint had to be filed").

adverse action inquiry is the same under the Rehabilitation Act, the ADA, Title VII, and the First Amendment," *Kelly v. N.Y. State Office of Mental Health*, 200 F. Supp. 3d 378, 403 (E.D.N.Y. 2016), and includes "any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination,'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). To establish the requisite causal connection, the retaliation must be a "'but-for' cause of the employer's adverse action." *Id.*; *see also Moy v. Perez*, 712 F. App'x 38, 40 (2d Cir. 2017) (same). Causation can be proven (1) directly "through evidence of retaliatory animus directed against the plaintiff by the defendant"; or (2) indirectly either (a) "by showing that the protected activity was followed closely by discriminatory treatment," or (b) "through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (citation omitted).

Defendants argue that, considering only the timely allegations — that is, allegations of Defendants' conduct in 2017 — Plaintiff fails to state a Title VII retaliation claim because she fails to allege a plausible causal connection between her protected activity and the adverse action. (Defs.' Mem. 8.)[5] As an initial matter, however, the Court is not limited strictly to consideration of the timely allegations, for "expiration of the limitations period does not bar 'an employee from using the prior acts as background evidence in support of a timely claim.'" *Davis-Garett v. Urban Outfitters, Inc.*, — F.3d —, 2019 WL 1510428, at *9 (2d Cir. Apr. 8, 2019) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)); *see also Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176–77 (2d Cir. 2005) (same); *Orlando v. BNP*

_____

[5] As noted, Defendants do not move to dismiss Plaintiff's Title VII hostile work environment claim. (*See* Defs.' Mem. 4.)

*Paribas N. Am., Inc.*, No. 14-CV-4102, 2015 WL 6387531, at *18 (S.D.N.Y. Oct. 22, 2015) (noting that, even where certain allegations are time-barred, a plaintiff may still "use the prior time-barred acts as background evidence in support of a timely claim of workplace discrimination" (citation, alterations, and quotation marks omitted)); *Taylor v. N.Y.C. Dep't of Educ.*, No. 11-CV-3582, 2012 WL 5989874, at *5 (E.D.N.Y. Nov. 30, 2012) (explaining that an untimely discriminatory act "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue" (quoting *United Air Lines v. Evans*, 431 U.S. 553, 558 (1977))).

More fundamentally, on the merits, Plaintiff states a Title VII claim of retaliation sufficient to survive a motion to dismiss. Plaintiff alleges that, in early December 2017, upon returning to work at Mid-Hudson from a leave of absence, Simms, a senior SHTA and supervisor — and a friend of Schoonemaker — told Plaintiff that "we are watching you." (SAC ¶ 61.) Plaintiff "informed" Thorne, a weekend supervisor, about Simms' statement on December 10, 2017, and Thorne "agreed" that Simms' comment "was harassment." (*Id.* ¶¶ 49, 62.) Five days later, Simms assigned Plaintiff to monitor a "male patient who sexually exposes himself during masturbation in [Plaintiff's] presence" and "typically ejaculates in front of [Plaintiff] every day." (*Id.* ¶¶ 59–60.) Plaintiff was required to monitor this patient until at least September 2018, the time of the filing of the Second Amended Complaint, for "approximately two hours per shift, six days a week." (*Id.* ¶ 60.) Simms assigned Plaintiff to this patient contrary to Mid-Hudson's own "policy that prohibits subjecting a female SHTA to highly sexualized environment[s]," and Simms kept Plaintiff on this assignment even after Plaintiff complained directly to Simms. (*Id.* ¶¶ 63–64.) Plaintiff also complained about the patient assignment to Davis — another supervisor SHTA who was friends with Schoonemaker — who stated "that she could not make an exception

for [Plaintiff]." (*Id.* ¶¶ 66–67.)

As to the first and second elements required to state a Title VII retaliation claim, Plaintiff's complaint to Thorne plausibly constitutes protected activity of which Mid-Hudson was aware. *See St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 322 (E.D.N.Y. 2014) ("The complaint can be informal — an employee does not need to lodge a formal complaint of discrimination." (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000))); *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 227–28 (E.D.N.Y. 2010) ("It is clearly established that informal complaints to supervisors constitute protected activity under Title VII." (citation and quotation marks omitted)); *Correa v. Mana Prods., Inc.*, 550 F. Supp. 2d 319, 327 (E.D.N.Y. 2008) (noting that protected activity includes "informal protests of discriminatory employment practices, including making complaints to management" (citing *Sumner v. U.S.P.S.*, 899 F.2d 203, 209 (2d Cir. 1990))). That is especially so considering, as background evidence, that Plaintiff had earlier made numerous complaints in 2015 and 2016 to other Mid-Hudson supervisors regarding other alleged instances of workplace harassment connected with Schoonemaker and her friends. (*See* SAC ¶¶ 24, 29, 31, 33.)

As to the third and fourth elements required to state a Title VII retaliation claim, Simms' assignment of Plaintiff to the masturbating patient plausibly constitutes adverse employment action that is causally connected to Plaintiff's protected activity. To be sure, where work "assignments fall within the duties of a plaintiff's position," as here, "receiving unfavorable . . . work assignments does not, without more, rise to the level of an adverse employment action." *Guity v. Uniondale Union Free Sch. Dist.*, No. 15-CV-5693, 2017 WL 9485647, at *17 (E.D.N.Y. Feb. 23, 2017) (citation and quotation marks omitted), *adopted by* 2017 WL 1233846 (E.D.N.Y. Mar. 31, 2017). However, where the assignment is more than a "mere inconvenience"

and results in a "material detriment to the employee's working conditions," *Arroyo-Horne v. City of New York*, No. 16-CV-3857, 2018 WL 4259866, at *11 (E.D.N.Y. Sept. 5, 2018) (citations omitted), or where the assignment is "demeaning," *Phillip v. Dep't of Sanitation*, No. 16-CV-2412, 2019 WL 1004588, at *8 (E.D.N.Y. Feb. 28, 2019) (citation omitted), the assignment may qualify as an adverse employment action. Here, Simms' assignment of Plaintiff to the masturbating patient — made days after threatening Plaintiff that she was "watching" her, done contrary to Mid-Hudson policy, and continued for months despite Plaintiff's complaint to Simms and others about the "stress" of the assignment, (SAC ¶ 66) — plausibly constitutes a "material detriment" in Plaintiff's working conditions and a "demeaning" task that qualifies as an adverse employment action that is causally connected to Plaintiff's protected activity. *See Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004) (holding adverse employment action established where the plaintiff, a probationary employee, offered evidence that his employer acted *contrary to policy* by assigning him a heavier workload than a permanent employee (emphasis added)); *see also O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004) (holding adverse employment action established where "the conditions in which [the employee] works are changed in a way that subjects her to a *humiliating*, *degrading*, unsafe, unhealthful, or otherwise *significantly negative alteration* in her workplace environment" (emphasis added) (citation omitted)); *cf. Rodas v. Town of Farmington*, 567 F. App'x 24, 27 (2d Cir. 2014) (holding no adverse employment action where the plaintiff "conceded that the purportedly degrading work assignments were within his job description"); *Arroyo-Horne*, 2018 WL 4259866, at *12 (holding allegation that change in work schedule not an adverse employment action where the plaintiff did "not allege[] that the schedule change had any impact on the conditions of her employment" (citation omitted)); *Pothen v. Stony Brook Univ.*, No. 13-CV-6170, 2018 WL

4635729, at *9 (E.D.N.Y. July 6, 2018) (collecting cases holding that receipt of unfavorable work assignments alone does not constitute adverse employment action). That is especially so considering, as background evidence, the allegations that Simms was friends with Schoonemaker, (SAC ¶ 61), that Simms "was part of a [weekly] management group meeting and had knowledge of [Plaintiff's] [June 2015] complaint to State Police" regarding harassment by Schoonemaker and her friends, (*id.*), and that Plaintiff had previously been subjected to other instances of sexual harassment by Schoonemaker and her friends, including being texted "graphic sexual images of Garcon performing oral sex with a man," because of an allegedly "stereotypical view of [Plaintiff's] sexuality and activity," (*id.* ¶¶ 37–38). This background evidence, "although not actionable because [not timely], might nonetheless remain admissible at trial and could lead a rational jury to find a causal link between the protected activity and the actionable adverse acts." *Jute*, 420 F.3d at 177.

In sum, the Court concludes that Plaintiff alleges sufficient facts to plausibly suggest a prima facie case of retaliation.[6] Defendants remain free, however, to challenge Plaintiff's prima facie case at summary judgment and to offer a legitimate, nondiscriminatory reason for the alleged adverse employment action.

### 3. Equal Protection Claims Under § 1983

Plaintiff brings individual equal protection claims against Schoonemaker and Neale. (*See*

---

[6] The Court notes that Plaintiff's other timely allegation of retaliation — that Horne and Musa falsely accused Plaintiff in December 2017 of practicing witchcraft and voodoo, lighting candles, and depositing skeletons in Musa's car, (SAC ¶ 57) — fails because Plaintiff does not allege that she engaged in timely protected activity about which Horne and Musa knew. Plaintiff's December 2017 complaint to Thorne had to do with *Simms'* alleged threat, (*id.* ¶ 62), rather than anything to do with Horne and Musa. Further, Plaintiff's prior complaints to Mid-Hudson officials regarding Schoonemaker and her friends are time-barred. And, in any event, Plaintiff does not allege that Horne and Musa had knowledge of those prior complaints. However, the Court grants Plaintiff leave to further develop her timely allegations of retaliation.

SAC ¶¶ 84–92.)

Like Title VII, "the Fourteenth Amendment protects public employees from racial discrimination and retaliation for complaining about race discrimination." *Ward v. Shaddock*, No. 14-CV-7660, 2016 WL 4371752, at *11 (S.D.N.Y. Aug. 11, 2016). "In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004). "To act under color of state law or authority . . . , the defendant must 'have exercised power possessed by virtue of state law[,] and made possible only because the wrongdoer is clothed with the authority of state law.'" *Monsky v. Moraghan*, 127 F.3d 243, 245 (2d Cir. 1997) (citation and quotation marks omitted); *see also Defalco v. MTA Bus Co.*, 333 F. Supp. 3d 191, 198–99 (E.D.N.Y. 2018) ("State employees act under the color of state law when they act (1) in their official capacity clothed with the authority of state law, or (2) under pretense of law by purporting to act with official sanction." (citations and quotation marks omitted)). "It is axiomatic that under 'color' of law means 'pretense' of law and that acts of officers in the ambit of their personal pursuits are plainly excluded." *Monsky*, 127 F.3d at 245 (citation and some quotation marks omitted). "However, mere employment by the state does not mean that the employee's every act can properly be characterized as state action." *Patterson v. County of Oneida*, 375 F.3d 206, 231 (2d Cir. 2004). Rather, "[t]he dispositive test appears to be whether the defendants acted pursuant to power they possessed by state authority." *Defalco*, 333 F. Supp. 3d at 198–99 (citation omitted).

"Once the color of law requirement is met, a plaintiff's equal protection claim parallels [her] Title VII claim." *Vega*, 801 F.3d at 88. However, "equal protection claims under § 1983

cannot be based solely on the disparate impact of a facially neutral policy." *Reynolds v. Barrett*, 685 F.3d 193, 201 (2d Cir. 2012). Rather, a plaintiff "must sufficiently allege that defendants acted with discriminatory intent." *Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 68 (2d Cir. 2015) (citation omitted); *see also Reynolds*, 685 F.3d at 201 ("It is well established that proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." (citation, alterations, quotation marks omitted)). "[P]urposeful discrimination requires more than intent as volition or intent as awareness of consequences . . . . It instead involves a decisionmaker's undertaking a course of action *because of*, not merely in spite of, the action's adverse effects upon an identifiable group." *Reynolds*, 685 F.3d at 204 (emphasis added) (citation and quotation marks omitted). There must be, in other words, an allegation of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the [defendant's] action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

### a. Schoonemaker

Defendants argue that Plaintiff fails to establish that Schoonemaker acted under color of state law. (Defs.' Mem. 11.) The Court agrees. To act under color of state law, an individual "ordinarily" must "be a supervisor or have some position of authority or control over the plaintiff." *Kohutka v. Town of Hempstead*, 994 F. Supp. 2d 305, 317 (E.D.N.Y. 2014) (citation and quotation marks omitted). Put differently, "the defendant must have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Monsky*, 127 F.3d at 245 (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). "Where the individual defendant is merely a co-worker of the plaintiff, such claims are routinely dismissed." *Kohutka*, 994 F. Supp. 2d at 317; *see also Petrosky v. N.Y. State Dep't of Motor Vehicles*, 72 F. Supp. 2d 39, 63 (N.D.N.Y. 1999) ("Other courts have rejected the

contention that co-worker harassment was done under color of law 'when the harassment did not involve use of state authority or position.'").  Here, the Second Amended Complaint does not allege that Schoonemaker exercised a position of authority or control at all, let alone over Plaintiff; to the contrary, Plaintiff squarely alleges that Schoonemaker was, like Plaintiff, a non-supervisory SHTA co-worker.  (SAC ¶ 18.)

In response, Plaintiff argues that Schoonemaker acted under color of state law as a "functional" matter, because she wielded influence at Mid-Hudson, could bring "force to bear," and "us[ed] the machinery of the state" in allegedly conducting a campaign of harassment." (Pl.'s Mem. 20–21, 23; *see also* SAC ¶ 31 (alleging that Schoonemaker told Plaintiff that "she had been working for the State for many years, so she 'knows what to do' and how to create 'trouble' for [Plaintiff] in her job"); *id.* ¶ 86 (alleging that Schoonemaker "organized other co-workers who harassed [Plaintiff]").)  Plaintiff cites no case, however, finding a non-supervisory employee to be acting under the color of state law for § 1983 purposes.[7]  In any event, the allegations that Schoonemaker worked at Mid-Hudson for years, wielded influence at the facility, got other co-workers to harass Plaintiff, and generally knew how to "create trouble" at the facility do not plausibly suggest that she acted "*pursuant to* power [she] possessed by state authority," *Defalco*, 333 F. Supp. 3d at 198–99 (emphasis added), that she "exercised power possessed *by virtue of state law* and made possible *only* because [she] is clothed with the authority of state law," *Monsky*, 127 F.3d at 245 (emphasis added), that she "abuse[d] the position given to [her] by the State," *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 744 (2d Cir.

---

[7] The cases Plaintiff does cite, (*see* Pl.'s Mem. 21–24) — *Jemmot v. Coughlin*, 85 F.3d 61, 64–65 (2d Cir. 1996), *Raspardo v. Carlone*, 770 F.3d 97, 113–15 (2d Cir. 2014), and *Patterson*, 375 F.3d at 231 — are inapposite, as the first two cases do not even address the question whether the defendants acted under color of state law, and the third raised but did not decide the issue.

2003) (citation omitted), or that she acted under "*pretense* of law," *Monsky*, 127 F.3d at 245

(emphasis added). The same can be said of the allegation that, some five months after

Schoonemaker told Plaintiff that she "[knew] what to do" to "create 'trouble,'" Plaintiff was

falsely accused of patient abuse by two other SHTA friends of Schoonemaker and, ultimately,

suspended from work by Mid-Hudson for two months. (*See* SAC ¶¶ 31–32, 43–44.) Not only

does Plaintiff fail to plausibly connect the (vague) threat by Schoonemaker to the later false

accusation, Plaintiff fails entirely to allege Schoonemaker's own involvement in Mid-Hudson's

investigation and suspension of Plaintiff (about which the Second Amended Complaint provides

almost no detail). In other words, Plaintiff pleads insufficient facts to establish that the false

accusation and suspension were "accomplished through power available to [Schoonemaker] by

virtue of [her] status as" a non-supervisory SHTA at Mid-Hudson. *Defalco*, 333 F. Supp. 3d at

199 (citation and quotation marks omitted). The Court therefore concludes that Schoonemaker

did not act under color of state law in allegedly harassing and retaliating against Plaintiff.

Accordingly, the Court dismisses Plaintiff's § 1983 claim as to Schoonemaker. *See Kohutka*,

994 F. Supp. 2d at 317 (dismissing § 1983 claims against defendants who did not exercise

supervisory authority over the plaintiff); *Wyatt v. City of Barre*, 885 F. Supp. 2d 682, 697 (D. Vt.

2012) (same); *cf. Dawson v. County of Westchester*, 351 F. Supp. 2d 176, 194–95 (S.D.N.Y.

2004) (holding that a defendant acted under the color of state law for purposes of § 1983 where,

"as [the] plaintiffs' supervisor, [he] told [the] plaintiffs he would investigate the source of

[harassing] letters in his official capacity, but apparently failed to do so").[8]

---

[8] Plaintiff's § 1983 equal protection claim does not explicitly allege conspiracy. (*See* SAC ¶¶ 84–92.) To be sure, Plaintiff does appear to suggest that Schoonemaker "organiz[ed] a concerted action of the State's employees, including supervisors," (*id.* ¶ 27; *see also id.* ¶¶ 37, 44 (same)), and that Schoonemaker's alleged "friends" at Mid-Hudson "echoed" Schoonemaker, "rallied around her," and otherwise harassed Plaintiff "with" Schoonemaker, (*id.* ¶¶ 26, 30, 37,

Defendants argue that the Second Amended Complaint fails to allege that Neale — Mid-Hudson's highest-ranking supervisory official, (*see* SAC ¶¶ 8, 39–40) — acted with discriminatory intent or purpose.  (Defs.' Mem. 14.)  The Court agrees.  Plaintiff makes three specific allegations as to Neale.  She alleges that, in the summer of 2015, following the alleged text-message harassment by Garcon, Plaintiff complained to Neale, who told Plaintiff to "erase" and "ignore" the "messages and images."  (SAC ¶¶ 39–40.)  Plaintiff next alleges that Neale told Peterson, another SHTA, "that because [Plaintiff] had reported the physical harassment to the police 'outside' the world of [Mid-Hudson], she was now an '*enemy of the State*' and would be treated accordingly."  (*Id.* ¶ 41 (emphasis in original).)  And Plaintiff finally alleges that she was suspended by Mid-Hudson following the allegedly false and retaliatory report of patient abuse even though Neale "well understood" that the allegation was false.  (*Id.* ¶ 45.)  Yet, none of these allegations suggests that Neale's *own* actions were taken "because of, not merely in spite of, the action's adverse effects upon" Plaintiff's national origin, race, or gender, *Reynolds*, 685 F.3d at 204 (citation and quotation marks omitted), or that Neale acted with a "discriminatory motivation," *Littlejohn*, 795 F.3d at 307, such that it may be said that Neale acted with the requisite "discriminatory intent" to state an equal protection claim, *Burgis*, 798 F.3d at 68.  Plaintiff does not allege, for example, that Neale himself engaged in discriminatory name-calling

_____

43, 59).  Because Plaintiff is represented by counsel, however, the Court will not connect the dots for her.  Rather than consider this un-alleged claim at this time, the Court grants Plaintiff leave to re-plead a claim of conspiracy under 42 U.S.C. § 1983 or 42 U.S.C. § 1985, if she chooses to do so.  In so pleading, Plaintiff is reminded that she "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end," *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (citation omitted), and "must allege facts demonstrating that [Schoonemaker] acted in concert with the state actor to commit an unconstitutional act," *Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (citation omitted).

or other harassment, that Neale threatened Plaintiff, or that Neale otherwise acted (or failed to act) in a way suggesting discriminatory "animus or ill-will." *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002). Rather, Plaintiff has merely "cite[d] to [her alleged] mistreatment and ask[ed] the court to conclude that it must have been related" to her national origin or gender. *Id.* (citation omitted). Therefore, the Court dismisses Plaintiff's equal protection claim against Neale. *See Hayden v. Paterson*, 594 F.3d 150, 159 (2d Cir. 2010) (holding that equal protection claim must be dismissed because the complaint included "no specific factual allegations of discriminatory intent"); *N.Y. Immig. Coalition v. U.S. Dep't of Commerce*, No. 18-CV-5025, 2018 WL 4292673, at *2 (S.D.N.Y. Sept. 7, 2018) (dismissing discrimination claim as to certain defendants where the plaintiffs "allege[d] no facts from which one could reasonably make [the] inference" that the defendants acted with a racially discriminatory intent or purpose); *Risco v. McHugh*, 868 F. Supp. 2d 75, 105 (S.D.N.Y. June 14, 2012) (dismissing discrimination claim where "there is no evidence in the record to support an inference of racial animus on the part of . . . the ultimate decision-maker" (citing *Patterson*, 375 F.3d at 221–23)); *see also DiPizio v. Empire State Dev. Corp.*, 745 F. App'x 385, 391 (2d Cir. 2018) (dismissing discrimination claim where "[n]one of these [allegations] furnishes any support for the existence of sex discrimination, whether considered individually or in the aggregate").

### III. Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted in part and denied in part. Dismissal is without prejudice. If Plaintiff wishes to file a third amended complaint, Plaintiff must do so within 30 days of the date of this Opinion. Plaintiff should include within the third amended complaint any changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. Plaintiff is advised that the third amended complaint

will entirely replace, not supplement, all earlier complaints. If Plaintiff fails to abide by the 30-day deadline, her claims may be dismissed with prejudice.

The Clerk of the Court is respectfully requested to terminate the pending motion. (Dkt. No. 36.)

SO ORDERED.

DATED:   May 2, 2019
         White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE