UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LAFONTANT,

                                    Plaintiff,

                    v.

MID-HUDSON FORENSIC
PSYCHIATRIC CENTER ET AL.,

                                    Defendants.

No. 18-CV-23 (KMK)

OPINION & ORDER

---

Appearances:

Antoinette LaFontant
Goshen, NY
*Pro Se Plaintiff*

Matthew J. Lawson, Esq.
Rebecca D. K. Culley, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Antoinette LaFontant ("Plaintiff") brings this Action against Mid-Hudson Forensic

Psychiatric Center ("Mid-Hudson") and James Neale ("Neale") (collectively, "Defendants"),

alleging that Defendants maintained a hostile work environment and retaliated against her on the

basis of her national origin and sex, in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment.  (Fourth

Am. Compl. ¶¶ 2–3 (Dkt. No. 46).)  Before the Court is Defendants' Motion for Summary

Judgement (the "Motion").  (Not. of Mot. (Dkt. No. 90).)  For the reasons set forth herein, the

Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from Defendants' statements pursuant to Local Civil Rule 56.1 and Plaintiff's Local Civil Rule 56.1 Response.  (Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 92); Pl.'s Decl. in Opp. to Defs.' Mot.) (Dkt. No. 111).)  Additionally, where appropriate, the Court cites directly to the admissible evidence submitted by the Parties.  The facts as described below are in dispute to the extent indicated.

Mid-Hudson is a secure adult psychiatric center that provides evaluation, treatment and rehabilitation to mentally ill patients requiring in-patient care.  (Defs.' 56.1 ¶ 2.)  Mid-Hudson patients are mostly male and include felony defendants found unfit to stand trial, defendants found Not Responsible for Criminal Conduct due to Mental Disease or Defect, pre-trial detainees and inmates in State and local correctional facilities in need of inpatient care.  (*Id*. ¶ 3.)  Plaintiff has been employed as a Security Hospital Treatment Assistant ("SHTA") at Mid-Hudson since February 2013.  (*Id*. ¶ 4.)  As an SHTA, Plaintiff is responsible for providing a safe and therapeutic environment for psychiatric patients and staff at secure facilities, teaching and promoting positive behaviors, implementing treatment goals through patient interaction, and personally assisting patients in attending to personal hygiene tasks.  (*Id*. ¶ 5.)

Defendant Neale was the Chief SHTA at Mid-Hudson from 2006 until his retirement on October 27, 2016.  (*Id*. ¶ 6.)  Because of accrued leave, his last working day at Mid-Hudson was September 5, 2016.  (*Id*.)  Christine Petito-Thorn ("Petito-Thorn") was the Acting Chief/Chief SHTA at Mid-Hudson after Neale retired and until her retirement in July 2020.  (*Id*. ¶ 7.)  As Chief SHTAs, Neale and Petito-Thorn were the overall managers of the Mid-Hudson SHTA department.  (*Id*. ¶ 8.)  Neale and Petito-Thorn were responsible for planning 24/7 therapeutic

and custodial care and overseeing the participation of SHTAs in the treatment process, implementing and formulating SHTA policies, and performing administrative and fiscal responsibilities for the SHTA department.  (*Id*.)

The New York State Justice Center for People With Special Needs (the "Justice Center") is an agency charged with independently investigating allegations of patient abuse by employees at state psychiatric hospitals, such as Mid-Hudson.  (*Id*. ¶ 9.)  All reports of abuse or neglect of patients at Mid-Hudson must be reported to the Justice Center.  (*Id*. ¶ 10.)

Clara Simms ("Simms") is a Senior SHTA at Mid-Hudson who worked Tour 3, the overnight tour during the times Plaintiff worked Tour 3 from December 1, 2017 to October 19, 2018.  (*Id*. ¶ 11.)  Simms is responsible for supervising SHTAs assigned to her tour.  (*Id*. ¶ 12.)  Her duties include directing post assignments, working closely with treatment teams on clinical patient issues, and reviewing upon completion all required patient supervision documentation by SHTAs on her tour.  (*Id*.)  As a Senior SHTA, Simms reports to Supervising SHTAs, including Betty Davis ("Davis"), on her tour.  (*Id*.)  Davis was one of Simms' Supervising SHTAs during the time that Simms was assigning Plaintiff to posts on ward 26 from December 1, 2017, until October 19, 2018.  (*Id*. ¶ 13.)  As a Supervising SHTA, Davis's duties include: supervising Senior SHTAs, ensuring adequate coverage by SHTAs and Senior SHTAs throughout the facility and directing Senior SHTAs in the supervision of SHTAs.  (*Id*.)

Jose Segura has been Deputy Director of facility administrative services at Mid-Hudson since 2013.  (*Id*. ¶ 14.)  As part of his duties, Deputy Director Segura oversees the Human Resources Department and the workplace violence and employee assistance programs at Mid-Hudson.  (*Id*.)  Lisa Hendrickson was the workplace violence coordinator at Mid-Hudson when Plaintiff made a complaint of workplace violence against SHTA Stacey Schoonmaker on or

3

around June 3, 2015.  (*Id*. ¶ 15.)  As workplace violence coordinator, Hendrickson was responsible for intake and investigation of reports by Mid-Hudson employees of workplace violence.  (*Id*. ¶ 16.)  She reported to Deputy Director Segura.  (*Id*.)  Patricia Greenwood was Director of Human Resources when the Justice Center first investigated and substantiated a finding of physical abuse of a patient by Plaintiff.  (*Id*. ¶ 17.)  During the period of both Justice Center investigations into Plaintiff and the related disciplinary proceedings, Maria Mendez worked in Human Resources and provided logistical and administrative support to the Bureau of Employee Relations of the New York State Office of Mental Health ("BER") and the Justice Center.  (*Id*. ¶ 18.)

The only policy at Mid-Hudson regarding SHTA gender staffing directs that for every unit there must be one SHTA that matches the patient's gender on the unit to provide intimate personal care if needed.  (*Id*. ¶ 19.)  This policy is outlined in the SHTA Manual.  (*Id*.)  Otherwise, SHTA assignments are gender-neutral and made in accordance with the bid system and seniority.  (*Id*.)  Mid-Hudson does not have a specific policy that prohibits the assignment of female SHTAs to work with male patients that masturbate or engage in sexual behavior.  (*Id*. ¶ 20.)  However, if an SHTA reported to a supervisor that they were being targeted, assaulted, or harassed by a particular patient, then a separation order could be put in place keeping that SHTA from being assigned to that particular patient.  (*Id*.)  Moreover, even in less serious situations, every effort would be made to accommodate SHTA assignment preferences while ensuring adequate patient care and coverage of all posts on a given shift.  (*Id*.)

When SHTAs are assigned to one-to-one observation of a patient, they are required to observe policies and procedures outlined in the Mid-Hudson Levels of Patient Supervision Policy ("Patient Supervision Policy").  (*Id*. ¶ 21.)  One-to-one monitoring is a heightened level of

patient supervision for mentally ill patients with a high current risk of harm to self or others. (*Id.* ¶ 22.) Senior SHTAs are responsible for assigning SHTAs to one-to-two-hour posts of one-to-one monitoring at the beginning of every shift and then rotating the other SHTAs assigned to that shift, if possible, every two hours. (*Id.* ¶ 23.) SHTAs assigned to one-to-one monitoring have "sole responsibility for the continual direct visual contact of the identified patient." (*Id.* ¶ 24.) SHTAs are required to document the patient's mental/physical/behavior status on the MHPC Special Observational Levels and Restraint or Seclusion Monitoring Form (98 Med) ("Observation Sheet") at least every 15 minutes. (*Id.* ¶ 25.) They must also maintain a clear line of sight of the patient on one-to-one monitoring. (*Id.*) Documentation should include a concise description of patient behavior and staff interventions during the supervision period. (*Id.*) This information must be recorded on the Observation Sheet by the assigned SHTA as the Observation Sheet is the official record of the specific time and duration of the assigned SHTA's responsibilities. (*Id.*) Assigned SHTAs must sign their names next to every fifteen-minute entry they make on the Observation Sheet. (*Id.*) The first page of the Observation Sheet for each shift details the specific risks that are the basis for the patient's one-to-one monitoring need and what an SHTA should do if the patient engages in that behavior on her shift. (*Id.* ¶ 26.)

Plaintiff worked on ward 26 between December 1, 2017, and mid-October 2018, mostly on Tour 3, the overnight tour, which runs from 10:45 p.m. to 7:00 a.m. (*Id.* ¶ 27.) During this period, Simms was responsible for assigning Plaintiff to posts on ward 26 on Tour 3. (*Id.* ¶ 28.) Included in the posts that Simms had to fill was a post for hourly shifts of one-to-one monitoring of a patient named P M ("P.M."). (*Id.*) When Plaintiff worked on ward 26, Simms assigned her to one-to-one monitoring shifts of P.M. (*Id.* ¶ 29.) Simms gave this assignment to "[e]very

SHTA," male and female, "that worked on ward 26 when Plaintiff was working under [her] supervision." (*Id*. ¶ 30.)

Other female SHTAs that Simms assigned to monitor P.M. when Plaintiff was working under Simms supervision on ward 26 included SHTA Brownridge, SHTA McGee, SHTA Nixon, and SHTA Gorton. (*Id*. ¶ 31.) Plaintiff disputes this, stating that SHTA Nixon was not a regular staff member assigned to ward 26 during the time Plaintiff was working on the ward. (Pl.'s Decl. ¶ 2.) Plaintiff was never assigned to monitor P.M. in any way other than one-to-one monitoring. (Defs.' 56.1 ¶ 32.) At the time Plaintiff worked where P.M. resided, P.M. was on one-to-one monitoring because he had a long history of self-injurious behavior including swallowing inedible objects that had required surgeries, snorting food, and engaging in self-injurious sexual behavior including masturbation and/or tugging or pulling on his genitals. (*Id*. ¶ 33.) Every SHTA, including Plaintiff, that was assigned to one-to-one monitoring of P.M. was required to accurately describe and write down his behavior at least once every fifteen minutes in P.M.'s Observation Sheets. (*Id*. ¶ 34.) Plaintiff did not make any entry in P.M.'s Observation Sheets documenting any masturbation, ejaculation, or other sexual behavior by P.M. when she was assigned to one-to-one monitoring. (*Id*. ¶ 35.) Plaintiff also did not document any offensive or sexual comments by P.M. (*Id*. ¶ 36.) The majority of Plaintiff's entries in P.M.'s Observation Sheets documented that P.M. was sleeping with hands visible. (*Id*. ¶ 37.) There were no entries in the Observation Sheets from any other SHTAs assigned to monitor P.M. when Plaintiff was working on P.M.'s ward that documented any instances of P.M. engaging in masturbation, ejaculation or any other sexual behavior, nor were there any such entries documenting offensive comments by P.M. (*Id*. ¶ 38.) P.M.'s observation sheets were reviewed from the period from December 1, 2017, until October 19, 2018, when Plaintiff was not assigned to work on P.M.'s

ward and a small number of entries in this latter collection of observations noted masturbation by P.M. from the assigned SHTA.  (Petito-Thorn Decl. ¶ 28 (Dkt. No 96).)  Defendants and Plaintiff agree that at Plaintiff's deposition, she admitted that the pleaded allegation that P.M. masturbated in her presence every day, which is set forth in her Fourth Amended Complaint, is a false statement.  (Defs.' 56.1 ¶ 40.)

Defendants contend that Simms also did not once see P.M. engage in sexual behavior, such as masturbation, ejaculation or making sexual comments on the tours when Plaintiff was working on P.M.'s ward.  (*Id*. ¶ 39.)  Plaintiff responds that Simms never sat on the ward to see what was going on.  (Pl.'s Decl. ¶ 3.)  Simms made her rounds every two hours and signed the patient count sheets.  (*Id*.)  This process lasted approximately two minutes and thus, Plaintiff claims, Simms was not on the ward long enough to see P.M masturbating.  (*Id*.)

Defendants state that Plaintiff never complained to anyone that P.M. masturbated in her presence while she was performing one-to-one observation.  (Defs.' 56.1 ¶ 41.)  Plaintiff disputes this, stating she:

> filed a complaint with Sr. J. Greiner, Nurse Gostischa, and Supervisor B. Davis, Dr. C. Orlando. Supervisor Davis responded to Plaintiff that ward 26 is Pt P.M's house, and when he is in his room, he can masturbate as much as he wants, because when you (Lafontant) are in your bedroom at your house, you do the same if you can't take it or well.  From that point on, every time I watched Pt P.M, I had to cover my lap with a towel in order to conceal my private area. I couldn't say anything to Sr Simms because she had forbidden me to talk to her because she had discovered that I knew she had lied about me to Supervisor B. Davis, and she was still not talking to me.  I even reported to Chief Parker and Union representative C. Ohia that I had been treated differently by Sr Simms . . . .

(Pl.'s Decl. ¶ 4.)

It is undisputed that Mid-October 2018 was the first time Petito-Thorn, Davis, or Simms were notified that Plaintiff did not want to be assigned to P.M.  (Defs.' 56.1 ¶ 42.)  A separation

order was issued, and Plaintiff was removed from P.M.'s ward around approximately October 16, 2018.  (*Id*. ¶ 43.)

On August 18, 2017, Oneida Musa, a registered nurse working at Mid-Hudson, made a complaint to the Bureau of Safety and Security Services of the New York State Office of Mental Health.  (*Id*. ¶ 44.)  The officer that received Musa's complaint wrote an "Incident or Investigation Report" about this complaint that stated, among other things: "On 08/18/17 at 0730 hours, RN Oneida Musa reported to post I that she believed a death threat was put on her."  (*Id*. ¶ 45.)  "RN Musa went out to her vehicle (a silver Infiniti LP CJXI 157) in the parking lot and discovered a bone under her windshield. [sic] In her culture of Voodoo, it is seen as a sign curse or death threat."  (*Id*.)  Plaintiff testified that Petito-Thorn informed her that it was "reported to [Petito-Thorn] that [Plaintiff] placed skeletons in Musa's car."  (Lawson Decl. Ex. B, at 263:24-64:9 (Dkt. No. 93).)

Plaintiff states that Musa has made numerous claims against the SHTA department and that the only prior interaction she and Musa had was when Musa accused her of sleeping on a camera unit.  (Pl.'s Decl. ¶ 5.)  This accusation was proven false after a year-long investigation by the Justice Center.  (*Id*.)  Since then, Musa started to claim that Plaintiff practices voodoo and placed a bone beneath her windshield because Plaintiff is Haitian.  (*Id*.)  Plaintiff claims that the facility could have effectively cleared her of these accusations by running her badge and watching the parking lot cameras to see if she left the facility that night.  (*Id*.)  In response to the content of the complaint, Plaintiff states that she was on administrative leave at the time Musa filed her complaint and could not come on facility property.  (*Id*. ¶ 6.)

On December 15, 2017, Vernice Horne, a registered nurse working at Mid-Hudson, made a workplace violence complaint that was received by Mid-Hudson's Workplace Violence

Coordinator.  (Defs.' 56.1 ¶ 46.)  Plaintiff claims that she has never had any negative encounters

or conversations with Horne and believes that Horne filed this complaint because Horne and

Musa are colleagues or even friends.  (Pl.'s Decl. ¶ 7.)  Plaintiff supposes that they are friends

because Plaintiff has seen them engage in lengthy conversations.  (*Id*.)  That workplace violence

complaint quotes Nurse Horne as stating that:

> I went to use the employee restroom and there was a strange sent [sic].  On the
> ledge in the restroom was a glass candle jar with purple candle wax with some
> lumps in it.  I left without using the restroom.  I have noted strange events happening
> since [Plaintiff] returned to work after being out for approximately 1 year.  I was
> working on Unit 21 where an incident occurred involving her 1 year ago. I am
> suspicious of this event.  This is culturally offensive.  I called Central Staffing and
> reported it to Carol Reed.

(Defs.' 56.1 ¶ 47.)  Plaintiff disputes this, stating that:

> Employees of the SHTA department are thoroughly searched upon entering
> MHFPC. We first pass through a standup walk-through metal detector, and then
> our personal items including meals are scanned by an X-ray scanner. Making it
> difficult for any of the SHTAs to bring in any type of glass. Once again, I am being
> targeted because of my ancestry (Haitian). MHPFC employs well over a hundred
> women. MHFPC has received numerous complaints regarding the open racism that
> exists there, and it is continuously brushed under the rug. I do not practice voodoo
> and have never done so. I am a Christian, and I find it both racist and offensive that
> these two RNs continuously refer to me as a voodoo practitioner. In addition, an
> investigation was made by Nurse Gostischa and was unfounded.

(Pl.'s Decl. ¶ 8.)

On June 2, 2015, Supervising SHTA James Parker informed Chief Neale that Plaintiff

had complained to him that SHTA Schoonmaker was allegedly harassing her because she was

romantically involved with the same colleague as SHTA Schoonmaker.  (Defs.' 56.1 ¶ 48.)

Plaintiff disputes that she was ever romantically involved with the same colleague as SHTA

Schoonmaker.  (Pl.'s Decl. ¶ 9.)  On June 3, 2015, the next day, Neale issued a separation order

between Plaintiff and SHTA Schoonmaker, notifying SHTA leadership and the Executive

Director at Mid-Hudson that these employees were in conflict and should not be staffed together.

(Defs.' 56.1 ¶ 49.)  Neale also reported Plaintiff's complaint to the workplace violence coordinator at that time, Lisa Hendrickson.  (*Id*. ¶ 50.)  Defendants state that Hendrickson met with Plaintiff to discuss her allegations of workplace violence against SHTA Schoonmaker in early June 2015.  (*Id*. ¶ 51.)  Plaintiff states that multiple witnesses were present but the witnesses were not willing to tell the truth because SHTA Schoonmaker has been on the job for over twenty-five years while Plaintiff has only worked there for two years.  (Pl.'s Decl. ¶ 10.)  Plaintiff states the witnesses felt obligated to be loyal to SHTA Schoonmaker and not to be involved.  (*Id*.)

On September 11, 2015, Hendrickson completed her investigation into Plaintiff's allegations, and sent Plaintiff a response in which she wrote that after interviewing most of the individual witnesses Plaintiff had identified, she had found no one who corroborated Plaintiff's allegations against SHTA Schoonmaker.  (Defs.' 56.1 ¶ 52.)  Plaintiff disputes that Hendrickson ever responded to her allegation.  (Pl.'s Decl. ¶ 11.)  Plaintiff claims she voluntarily went to Hendrickson's office and inquired about the outcome of the investigation after not hearing back on her allegation for months.  (*Id*.)

A Mid-Hudson nurse reported that on November 9, 2015, Plaintiff had slapped a patient, and the matter was reported to the Justice Center.  (Defs.' 56.1 ¶ 53.)  Plaintiff states that "the Pt. S.S. made repeated claims that I had not slapped her, which I did not."  (Pl.'s Decl. ¶ 12.)  Plaintiff states this "was to have taken place[] on a unit with surveillance cameras."  (*Id*.)

Human Resources notified Neale of the Justice Center investigation of Plaintiff for the purpose of addressing any related staffing issues for the facility.  (Defs.' 56.1 ¶ 54.)  Neale was prohibited from discussing the existence of a Justice Center investigation with any subordinate staff.  (*Id*.)  Neale was not present when Plaintiff purportedly slapped the patient.  (*Id*. ¶ 55.)

10

Neale was not involved in the Justice Center investigation of the slapping allegation either.  (*Id*. ¶ 56.)  Defendant states that the Justice Center issued a report of substantiated findings that was sent to Plaintiff, Mid-Hudson Executive Director Joseph Freebern, and patient S.S after investigation.  (*Id*. ¶ 57.)  Plaintiff responds that the Justice Center confirmed the claim and sent her a notice of discipline.  (Pl.'s Decl. ¶ 13.)  The Justice Center substantiated its report and found that Plaintiff had committed physical abuse when she slapped patient S.S. on November 9, 2015.  (Defs.' 56.1 ¶ 58.)  Plaintiff denies that physical abuse occurred, and no evidence of this claim can be found.  (Pl.'s Decl. ¶ 14.)  Plaintiff argues that the incident was not recorded on camera and no pictures of the patient were taken.  (*Id*.)  She claims that it was "Nurse Musa and Nurse Horne against Plaintiff."  (*Id*.)

At first, HR was notified by BER of the Justice Center's findings; HR Director Greenwood then directed Mendez to draft a notice of discipline ("NOD") and pre-clearance package for BER to review.  (Defs.' 56.1 ¶ 59.)  At the time of both Justice Center investigations into Plaintiff, Mendez was the Human Resources employee that drafted the NODs and compiled the pre-clearance packages for BER.  (*Id*. ¶ 60.)  As directed by BER, Mendez was given access to the Justice Center investigation files and drafted the first NOD based on BER Guidelines for penalties associated with physical abuse by an employee who worked in direct patient care.  (*Id*. ¶ 61.)  The BER guidelines provided that termination was the penalty for a first charge of abuse. (*Id*. ¶ 62.)  After BER sent Mendez a final NOD, HR Director Greenwood served Plaintiff with the NOD.  (*Id*. ¶ 63.)  Thereafter, Plaintiff chose to contest the NOD.  (*Id*. ¶ 64.)  Mendez assisted the Justice Center and BER in making arrangements for conference rooms for Justice Center attorneys to meet with witnesses.  (*Id*.)  Deputy Director Segura appeared on behalf of Mid-Hudson at the disciplinary hearing held on May 20, 2016, and all parties reached a

settlement of the NOD that would allow Plaintiff to return to work (rather than being terminated) (the "First Settlement Agreement").  (*Id*.)  The First Settlement Agreement stipulated that: (1) Plaintiff would "serve a suspension without pay from April 4, 2016 to May 20, 2016" and (2) "6 weeks of suspension without pay would be held in abeyance for a period of one year," but Plaintiff would face further penalties if she engaged in the same or similar misconduct.  (*Id*. ¶ 65.)  Neale did not participate in the Justice Center investigation, associated disciplinary hearing, or settlement negotiations related to this case.  (*Id*. ¶ 66.)

On March 20, 2017, Human Resources Director Greenwood was notified by BER that the Justice Center had substantiated a second report of abuse or neglect against Plaintiff.  (*Id*. ¶ 67.) Defendants state that the Justice Center charged Plaintiff with committing neglect when she "fell asleep" or was "less than alert while on duty" on November 5–6, 2016, resulting in patient D.I. tearing open a healing wound.  (*Id*. ¶ 68.)  Plaintiff states that this notice of discipline "was served with prejudice and malice."  (Pl.'s Decl. ¶ 15.)  She states that the Justice Center was not able to confirm whether she was sleeping when observing her on the camera on the day in question.  (*Id*.)  She further states that she was not assigned to patient D.I. at the time of occurrence and was instead reassigned to a different task.  (*Id*.)

Mendez, who had been appointed to Associate Human Resources Director at this time, was asked by BER to again draft this NOD in light of the Justice Center investigation files and assemble the pre-clearance package.  (Defs.' 56.1 ¶ 69.)  The BER guidelines provided that termination was an appropriate penalty for a second finding of abuse or neglect of a patient against an employee.  (*Id*. ¶ 70.)  Mendez sent a draft NOD and the pre-clearance package to BER for their approval.  (*Id*.)  On May 16, 2017, Mendez then served the final version of the NOD that she had received from BER on Plaintiff.  (*Id*. ¶ 71.)  Defendants state that after a

hearing on the second NOD, all parties reached a settlement on November 28, 2017 (the "Second Settlement Agreement"). (*Id.* ¶ 72.) The Second Settlement Agreement stipulated that: (1) Plaintiff would "serve a disciplinary suspension without pay from the period of June 2, 2017 through November 28, 2017," and (2) Plaintiff would "serve a one-year incident specific probationary period" and would be subject to further penalties if she committed misconduct similar to that discussed in the first NOD. (*Id.*) Plaintiff responds that she believes the staff member assigned to D.I. was exclusively at fault and should be the only one reprimanded but now Plaintiff and another staff member faced worse punishment. (Pl.'s Decl. ¶ 16.)

    B.  Procedural History

    Plaintiff commenced the instant Action on January 2, 2018. (*See* Compl. (Dkt. No. 1).) Plaintiff filed her Amended Complaint on July 17, 2018 (*see* Dkt. No. 30), her Second Amended Complaint on September 27, 2018 (*see* Dkt. No. 35), her Third Amended Complaint on May 29, 2019 (*see* Dkt. No. 44), and her Fourth Amended Complaint on July 9, 2019 (*see* Dkt. No. 46). On May 2, 2019, the Court granted in part and denied in part Defendants' Motion to Dismiss. (*See* Dkt. No. 41).[1] Defendants filed the instant Motion on November 23, 2021. (*See* Not. of Mot. (Dkt. No. 90); Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 91).) Defendants filed the requisite Local Rule 56.2 notice that same day. (Dkt. No. 98.) Plaintiff submitted her Opposition on January 28, 2022. (*See* Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 110).) Defendants replied on March 1, 2022. (*See* Reply Mem. of Law in Further Supp. of Mot. ("Defs.' Reply Mem.") (Dkt. No. 115).)

---

[1] In its Opinion, this Court held that "Plaintiff's [Title VII] 'claims based on facts that formed the basis of the first right-to-sue letter' — that is, those allegations as to Defendants' actions between March 2015 and June 2017 — are time-barred." *LaFontant v. Neale*, No. 18-CV-23, 2019 WL 1953942, at *6 (S.D.N.Y. May 2, 2019).

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted) (quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'"  *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

14

U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Laby's. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding

15

"statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (emphasis omitted) (quotation marks omitted).  Moreover, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vt. Teddy Bear Co*., 373 F.3d at 244; *see also Jackson v. Fed. Exp*., 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[ ] made in light of the opposing party's pro se status" (italics omitted)). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . .  are insufficient to overcome a motion for summary judgment." *Houston v. Teamsters Loc. 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y 2014) (alterations adopted) (italics omitted) (quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

B.  Analysis

    1.  Title VII Hostile Work Environment

"A hostile work environment claim requires a showing [1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)); *see also Perkins v. U.S. Dep't of the Treasury*, No. 18-CV-8911, 2022 WL 19772, at *15 (S.D.N.Y. Jan. 3, 2022) (same).  "[I]t is 'axiomatic that mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable . . . only when it occurs because of an employee's protected characteristic,' such as race or gender." *Lloyd v. Holder*, No. 11-CV-3154, 2013 WL 6667531, at *11 (S.D.N.Y. Dec. 17, 2013) (alterations adopted) (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).

The Second Circuit has held that "[p]roving the existence of a hostile work environment involves showing both 'objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'" *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (quoting *Alfano*, 294 F.3d at 374).  "[I]ncidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano*, 294 F.3d at 374 (quoting *Perry*, 115 F.3d at 149).  "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id*.  "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe.  They are not intended to promote or enforce civility, gentility[,] or even decency." *Isbell v. City of New York*, 316 F.

Supp. 3d 571, 591 (S.D.N.Y. 2018) (citation omitted).  "[E]xcessive criticism and rudeness do not constitute a hostile work environment."  *Ramirez v. Temin & Co*., No. 20-CV-6258, 2021 WL 4392303, at *8 (S.D.N.Y. Sept. 24, 2021).

### a.  P.M.'s Masturbation

Plaintiff's Fourth Amended Complaint alleges that Simms assigned Plaintiff to "monitor on a regular and constant basis" a patient that masturbated and ejaculated in Plaintiff's presence *every single time* that Plaintiff monitored him between December 15, 2017, and September 2018. (Fourth Am. Compl. ¶¶ 60–61.)  The Complaint further alleges that this masturbation was an "*everyday occurrence*" six days a week over the nine-month period that Plaintiff monitored the patient.  (*Id.*)  Plaintiff's pleading also asserts that the patient told Plaintiff that she "excites" him during these alleged masturbatory episodes; and that Plaintiff complained about the masturbation and related behavior to two supervisors, Simms and Davis, and that both supervisors supposedly ignored the complaints.  (*Id.* ¶¶ 60, 64, 67.)

It is undisputed that the "patient" to whom Plaintiff refers is P.M.  (Lawson Decl. Ex. B, at 56:8–16.)  Further, the "monitoring" to which the complaint refers is called "one-to-one observation" at Mid- Hudson.  (*Id.*)  As Plaintiff admits, every time she performed one-to-one observation of a patient, she was required to write a description of the patient's behavior at least once every 15 minutes in a form she calls an "observation sheet."  (*Id.* at 51:19–53:13.)  Plaintiff further admits that if a patient was talking and/or doing something offensive with his hands during these observation sessions, she would write that down in her entries.  (*Id.* at 53:21–54:6.)  Plaintiff's handwritten entries about P.M. were all produced in this litigation.  (*See* Petito-Thorn Decl. ¶ 24; *Id.* at Exs. C–J.)  There are scores of these entries, and all are accompanied by Plaintiff's own signature.  (*Id.*)  And, consistent with Plaintiff's testimony, she did write down

18

what P.M. was doing every fifteen minutes she watched him.  (*Id.*)  However, Plaintiff *never*

wrote a single thing about masturbation, ejaculation, or offensive comments.  (Petito-Thorn Decl.

¶ 25; Lawson Decl. Ex. B, at 96:16–23.)  In fact, Plaintiff mostly reported that P.M. was

"sleeping," (*see* Petito-Thorn Decl. ¶ 25), which is unsurprising, as Plaintiff generally watched

P.M. during the overnight shift, (*id.*; Lawson Decl. Ex. B, at 79:20–24).

      In response to defense counsel's questioning, Plaintiff admitted that the pleaded

allegation that P.M. masturbated in her presence every day is a false statement, (*id.* at 95:17–21),

that Plaintiff never wrote a single thing about masturbation in her one-to-one observation sheets

for P.M., (*id.* at 96:16–23), that P.M. never ejaculated in Plaintiff's presence a single time during

her one-to-one observation sessions, despite the pleaded allegation that she saw P.M. ejaculate

every day, (*id.* at 97:4–13), and that Plaintiff never told Simms or Davis about any alleged

masturbation during her one-to-one observation of P.M, even though her complaint alleged that

she complained to both of these supervisors, (*id.* at 99:18–100:15).  In fact, after initially

suggesting that she had complained to an unidentified nurse at a time she cannot remember,

Plaintiff admitted that she never complained to anyone that P.M. had masturbated in her presence

while she was performing one-to-one observation.  (*Id.* at 100:4–25.)  During her testimony,

Plaintiff also failed to identify a single offensive or sexual comment that P.M. made to her.  (*See*

*generally id.*)  Plaintiff then testified that when she saw P.M. ejaculate, someone else was

performing the one-on-one, but she could not recall who was performing the one-on-one or when

this occurred.  (*Id.* at 97:14–99:6.)

      On re-direct examination by her own counsel, Plaintiff further revised her allegations.

She claimed that, in total, she saw P.M. masturbating a maximum of ten times, (*id.* at 331:11–

15), with only "two" or "three" of these alleged instances occurring while Plaintiff herself was

monitoring P.M., (*id.* at 334:17–19).  Plaintiff claimed that the remaining incidents of

masturbation occurred while somebody else was monitoring P.M.—a theory not pleaded

anywhere in the Fourth Amended Complaint (which only mentions Plaintiff's own monitoring

sessions).  Elaborating on this new theory, Plaintiff testified that she would sit in the hallway

outside P.M.'s room in order to talk to the "staff" member assigned to monitor P.M. on certain

occasions, do a 15 minute "walk up and down the hallway," or "read[] a book."  (*Id.* at 332:9–

33:10.)  Plaintiff claimed that she saw P.M. masturbate between "one to ten times" in this

context.  (*Id.* at 334:20–25.)  During this same line of questioning by her own counsel—and in

direct contradiction to her earlier testimony—Plaintiff also that testified that, when she saw P.M.

masturbate, "I would report it to my senior [SHTA] and my supervisor."  (*Id.* 330:23–331:6;

*compare id.* at 99:18–100:25 (Plaintiff testified that she never told Simms, Davis, or anyone else

about alleged masturbation that had occurred during her one-to-one observation of P.M.).)

However, Simms and Petito-Thorn deny they ever heard such complaints from Plaintiff.  (*See*

Lawson Decl. Ex. E, at 98:24–100:18; Petito-Thorn Decl. ¶ 17.)  Indeed, Plaintiff admitted that

Mid-October 2018 was the first time Petito-Thorn, Davis, or Simms were notified that Plaintiff

did not want to be assigned to P.M.  (Defs.' 56.1 ¶ 42.)

Mid-Hudson also produced the observation sheets for every other SHTA that observed

P.M. over the times that Plaintiff worked on P.M.'s ward during the alleged period.  (Petito-

Thorn Decl. ¶¶ 24, 27; *Id.* at Exs. C–J.)  These observation sheets contain no mention of any

alleged masturbation, ejaculation or offensive comments by P.M.  (*Id.*)  P.M.'s observation

sheets were reviewed from the period from December 1, 2017, until October 19, 2018, when

Plaintiff was *not* assigned to work on P.M.'s ward, and a small number of entries in this latter

collection of observations noted masturbation by P.M. from the assigned SHTA.  (*Id.* ¶ 28.)
These observations were made both by male and female SHTAs.  (*Id.*)

It is a bedrock rule of civil procedure that "a district court generally cannot grant
summary judgment based on its assessment of the credibility of the evidence presented." *Agosto
v. INS*, 436 U.S. 748, 756 (1978).  In *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005),
however, the Second Circuit has recognized an exception "in the rare circumstance where the
plaintiff relies almost exclusively on [her] own testimony, much of which is contradictory and
incomplete." *Id*. at 554.  In such a case, "it will be impossible for a district court to determine
whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine
issues of material fact, without making some assessment of the plaintiff's account." *Id.*
(quotation marks and internal citation omitted).  "If there is a plausible explanation for
discrepancies in a party's testimony, the court considering a summary judgment motion should
not disregard the later testimony because of an earlier account that was ambiguous, confusing, or
simply incomplete." *Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112 (2d Cir.
1998).

In *Jeffreys*, a burglary suspect claimed to have lost consciousness after being assaulted by
police officers, who then allegedly threw him out of a third-story window.  426 F.3d at 551.  In
support of his claims, he offered testimony from relatives regarding his statements made to them,
his own deposition testimony, and prior statements.  *Id.* at 553.  This account was contradicted,
however, by three admissions (nine months earlier) that he had in fact "jumped" out of the
window, and testimony by the officers and medical professionals who concluded that Jeffreys
had not lost consciousness.  *Id.* at 552–53.  The plaintiff also could not identify the number of
individuals allegedly involved in the attack, nor he could he provide a description of their

ethnicities, physical features, facial hair, weight, or clothing.  *Id.* at 552.  The Second Circuit

affirmed the district court's grant of summary judgment agreeing that there was no genuine

dispute of fact that Jeffreys jumped and was not thrown out of the window.  *Id.* at 555.

This case falls within the *Jeffreys* exception. Here, as in *Jeffreys,* Plaintiff relies

exclusively on her own testimony.  No other witness has corroborated the claim that P.M. ever

masturbated, ejaculated, or made offensive comments in Plaintiff's presence at any time.

(Lawson Decl. Ex. E, at 98:24–100:18 (Simms denies she ever heard such complaints from

Plaintiff); Petito-Thorn Decl. ¶ 17 (Petito-Thorn denies that she ever heard such complaints from

Plaintiff).)  More importantly, Plaintiff's story is internally inconsistent, has dramatically

changed over time, and is contradicted by documentary evidence, including hospital records.  In

addition, not only do Plaintiff's contemporaneous entries fail to mention the masturbation that

supposedly occurred "every day"—they affirmatively, and without exception, state that P.M. was

doing something other than masturbating while Plaintiff was monitoring him.  Plaintiff has

"failed to explain away these obvious inconsistencies with any 'plausible explanation.'"

*Jeffreys,* 426 F.3d at 555 n.2.

Plaintiff's new story, which posits that Plaintiff would sit in the hallway outside P.M.'s

open door while somebody else was monitoring P.M., is not alleged in Plaintiff's Complaint.

Furthermore, this was "not an assignment" at Mid-Hudson.  (Lawson Decl. Ex. E, at 93:6–18.)

Only one SHTA was assigned to monitor P.M. at a time, (*id.* at 91:11–15), and if Plaintiff was

not herself fulfilling this role for a given period, she was supposed to be elsewhere (*id.* at

109:18–111:4).  Moreover, Mid-Hudson also produced the observation sheets for every other

SHTA that observed P.M. over the times that Plaintiff worked on P.M.'s ward during the alleged

period.  (Petito-Thorn Decl. ¶¶ 24, 27, 28; *Id.* at Exs. C–J.)  These observation sheets also

22

contain no mention of any alleged masturbation, ejaculation or offensive comments by P.M., while observation sheets, from times Plaintiff was not on shift, do contain such observations. (*Id.*)

Between the inconsistencies in Plaintiff's testimony, Plaintiff's admission that the allegations about P.M.'s masturbation in her Complaints were false, the contemporaneous records—written by Plaintiff herself and other SHTAs on duty during Plaintiff's shifts—that directly contradict Plaintiff's allegations, Plaintiff's inability to identify any specific instance of the alleged behavior by P.M., and the lack of supporting evidence beyond Plaintiff's own testimony, the Court finds that no reasonable jury could find in Plaintiff's favor. *See Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 105–06 (2d Cir. 2011) (per curiam) (holding that when plaintiff "relied almost entirely on her own testimony, in the form of an affidavit and excerpts from her depositions" and defendant "submitted competent and persuasive evidence, including contemporaneous letters and meeting notes" which refuted plaintiff's position, the district court was "entitled to assess [Plaintiff]'s factual averments" "in order to determine whether there were any genuine issues of material fact to be tried by a jury" and that "new allegations, directly contradicted by her prior sworn statements and judicial admissions, were properly rejected by the District Court after a careful consideration of the record before it"); *Jeffreys,* 426 F.3d at 555 (affirming district court's entry of summary judgment where "(1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe Jeffreys's testimony" (alteration adopted) (quotation marks and internal citation omitted)); *Jimenez v. City of New York*, No. 14-CV-2994, 2015 WL 5638041, at *6 (S.D.N.Y.

Sept. 24, 2015) (disregarding plaintiff's affidavit and granting summary judgement for defendants when a plaintiff "testif[ied] to a version of events that is contrary to that presented by all other witnesses.  Here, as [in *Jeffreys*], an array of contemporaneous statements and documents make the testimony of Mrs. Jimenez plainly incredible"); *Zobe v. Benash*, No. 08-CV-3937, 2012 WL 3953475, at *3 (S.D.N.Y. Sept. 6, 2012) ("This case falls within the *Jeffreys* exception. Plaintiff relies exclusively on his own testimony, and his characterization of the events underlying his claims has changed throughout the course of this litigation."); *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 470 (S.D.N.Y. 1998) (granting summary judgment against plaintiff after concluding that "[f]rom the complaint, to plaintiff's deposition, to his opposition papers to defendants' summary judgment motion, plaintiff's allegations of the events at issue are replete with inconsistent and contradictory statements").[2]

### b.  Skeletons, Voodoo, Candles, and Witchcraft

Plaintiff claims that two Mid-Hudson nurses falsely accused Plaintiff of practicing witchcraft and voodoo, lighting candles, and depositing skeletons in a car on two occasions, thus creating a hostile work environment.  (Defs.' 56.1 ¶¶ 44–46; Pl.'s Decl. ¶¶ 5–8.)  In particular,

---

[2] Even crediting Plaintiff's new allegations that she witnessed P.M. masturbate approximately ten times, this Court sees no "specific basis exists for imputing the objectionable conduct to the employer." *Alfano*, 294 F.3d at 373.  This second prong is satisfied if a plaintiff can show that the employer "failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (internal quotation marks omitted).  Plaintiff's supervisors affirmed that they were first notified of Plaintiff's allegations regarding P.M. when Plaintiff filed the instant Action and that they responded by removing Plaintiff from P.M.'s ward immediately, none of which Plaintiff disputes.  (Defs.' 56.1 ¶¶ 42–43; Petito-Thorn Decl. at ¶¶ 16–17, 20; Simms Decl. at ¶ 23.)  While Plaintiff notes in her Declaration that she "couldn't say anything to Sr Simms because [Simms] had forbidden [Plaintiff from] talk[ing] to her because [Simms] had discovered that [Plaintiff] knew [Simms] had lied about [Plaintiff] to Supervisor B. Davis, and [Simms] was still not talking to [Plaintiff]," (Pl.'s Decl. ¶ 4), Plaintiff does not state that she could not speak to other supervisors.

Plaintiff claims that she is "being targeted because of [her] ancestry (Haitian)" and that she "find[s] it both racist and offensive that these two RNs continuously refer[red] to [her] as a voodoo practitioner." (Pl.'s Decl. ¶ 8.) Defendants maintain that these allegations do not amount to severe or pervasive conduct. (Defs.' Mem. 11–12.)

"To survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000), *superseded on other grounds by* Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85, (internal quotation marks and citation omitted); *see also Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (holding that a workplace is hostile only if it "is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the victim's conditions of employment" (quotation marks and internal citation omitted)); *Pimintel v. Atrium Hosp. LP,* No. 19-CV-1284, 2022 WL 4104012, at *6 (D. Conn. Sept. 7, 2022) (same). "That analysis includes both an objective and a subjective component: 'a work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively perceived it." *Williams v. N.Y.C. Hous. Auth.*, 61 F4th 55, 69 (2d Cir. 2023) (alteration adopted) (quoting *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999)).

In determining whether a hostile environment exists, the Second Circuit has suggested consideration of five non-exclusive factors: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a 'mere offensive utterance'; (4) whether the conduct unreasonably interfered with plaintiff's work; and

(5) what psychological harm, if any, resulted." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) (internal quotation marks and citation omitted).  Second Circuit case law

> treats the first two of these factors—the frequency and the severity of the misconduct—as the principal focus of the analysis; the last three factors are specific considerations within the severity inquiry. Core hostile work environment cases involve misconduct that is both frequent and severe, for example, when a supervisor utters blatant racial epithets on a regular if not constant basis and behaves in a physically threatening manner.

*Id.* (quotation marks omitted).  We have explained that an employer's motion for summary judgment must be denied "if the conduct there is either so severe or so pervasive as to alter the working conditions of a reasonable employee." *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 440 (2d Cir. 1999), *abrogated on other grounds by Burlington N. & Sante Fe Ry. Co. v. White,* 548 U.S. 53 (2006).  Although "[i]solated incidents usually will not suffice to establish a hostile work environment . . . [the Second Circuit has] often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently 'severe.'" *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175–76 (2d Cir. 2021).  In the normal course, however, "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997) (quotation marks omitted).  "Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." *Id.* at 110–11 (quotation marks and internal citations omitted).

Taking Plaintiff's allegations as true, the Court concludes that Plaintiff has not made out a hostile work environment claim.  Plaintiff's claim involves two discrete accusations, each involving only one nurse.  First, Plaintiff has claimed that Nurse Vernice Horne accused Plaintiff

of lighting candles (or potpourri) in a bathroom.  (Lawson Decl. Ex. B at 261:22–262:17,

268:19–24).  Notably, Plaintiff does not claim that Nurse Horne accused Plaintiff of this conduct

to her face.  Instead, Plaintiff claims that she learned about this accusation from a "senior

[SHTA]."  (*Id.* at 265:21–266:13.)  Also, while Plaintiff characterizes this accusation as

tantamount to "voodoo," Plaintiff does not make any specific allegation that Nurse Horne used

that term or the term "witchcraft."  Nor does Plaintiff say when Nurse Horne made this

statement.

    The other accusation, made by Nurse Musa, is that Plaintiff placed a skeleton in Musa's

car.  (*Id.* at 263:15–265:9, 268:25–269:7.)  As with the accusation from Nurse Horne, Plaintiff

did not learn about this accusation directly from Nurse Musa, but from Chief SHTA Petito-

Thorn.  (*Id.* at 263:15–265:9.)  Also, as is the case with the allegation from Nurse Horne,

Plaintiff offers no evidence about when Nurse Musa made this statement about Plaintiff.

    Because Plaintiff's hostile work environment claims are based only on these two

incidents, summary judgment is appropriate.[3]  First, the fact that Plaintiff learned about these

alleged comments second-hand fatally undercuts Plaintiff's claim.  Of course, the fact that

---

[3] The Court notes that while Plaintiff's Complaint contained allegations of other allegedly discriminatory and hostile statements, the Court has already deemed them time-barred based on a violation of the 90-day rule, and, therefore, will not consider them here.  *LaFontant*, 2019 WL 1953942, at *6; *see also Pertillar v. AAA W. & Cent. New York*, No. 16-CV-238, 2018 WL 583115, at *3 (N.D.N.Y. Jan. 26, 2018) ("However, under Title VII, to the extent that Pertillar's claims in the instant suit are based on the same facts as those contained in his first two EEOC charges—charges for which he received right to sue notices but failed to timely commence a suit—those claims are time-barred. . . . Thus, Pertillar's Title VII claims cannot be supported by facts in his first two EEOC charges."); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 207 (E.D.N.Y. 2014) (noting that incidents that "were a part of her 2006 EEOC charge as part of her claim of sexual harassment, [] are barred from consideration by the Court because of Plaintiff's failure to sue within 90 days of receiving a right-to-sue letter in connection with those claims" with regards to a hostile work environment claim).

Plaintiff "was not present when [the comments were] made will not render [them] irrelevant to [her] hostile work environment claim." *Schwapp*, 118 F.3d at 111; *see also Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 71 (2d Cir. 2000) (finding that the district court erred in ruling that statements uttered outside plaintiff's presence had no probative value); *Torres v. Pisano,* 116 F.3d 625, 633 (2d Cir. 1997) ("[A]n employee who knows that her boss is saying [derogatory remarks] behind her back may reasonably find her working environment hostile."). However, "secondhand comments are not as impactful as on one's environment as are direct statements; consequently, they are less persuasive in stating a hostile work environment claim." *Sletten v. LiquidHub, Inc.*, No. 13-CV-1146, 2014 WL 3388866, at *7 (S.D.N.Y. July 11, 2014); *see also Woodard v. TWC Media Sols., Inc*., No. 09-CV-3000, 2011 WL 70386, at *12 (S.D.N.Y. Jan. 4, 2011), *aff'd,* 487 F. App'x 613 (2d Cir. 2012) ("[W]here plaintiff was not the direct recipient of harassing or threatening comments, they are far less persuasive in establishing a claim of hostile work environment."); *Yuknis v. First Student, Inc.,* 481 F.3d 552, 555–56 (7th Cir. 2007) (Posner, J.) ("Offense based purely on hearsay or rumor really is 'second hand'; it is less credible, and, for that reason and also because it is less confrontational, it is less wounding than offense based on hearing or seeing.").  "Indeed, when the *only* offensive statements are learned of secondhand, they are insufficiently 'severe and persuasive,' in and of themselves, to support a claim for a hostile work environment . . . ."  *Sletten*, 2014 WL 3388866, at *7; *see also Leibovitz v. N.Y.C. Transit Auth.,* 252 F.3d 179, 182 (2d Cir. 2001) (finding that the "prohibition against hostile work environment discrimination affords no claim to a person who experiences it by hearsay"); *Dabney v. Christmas Tree Shops,* 958 F. Supp. 2d 439, 459 (S.D.N.Y.2013); *Tavares v. Sam's Club,* 178 F. Supp. 2d 96, 101–02 (D. Conn. 2001) (holding that when "plaintiff has not alleged that any . . . derogatory statements were ever made to her or in her

presence," remarks later relayed to the plaintiff are insufficient to meet the "severe or pervasive" standard); *Kinzer v. Whole Foods Market, Inc.*, No. 20-CV-11358, 2023 WL 363586, at *11 n.12  (D. Mass. Jan. 23, 2023) (holding that "[a]llegations that [the plaintiff] and other coworkers heard some additional racist remarks from other coworkers are not enough to bolster the [retaliation] claim").  Here, Plaintiff has offered only the second-hand comments of what others told her about two isolated comments made by two coworkers.  As such, the Court finds that Plaintiff has not made out a triable hostile work environment claim for this reason alone.

Second, the fact that Plaintiff has identified only two hostile comments during her entire tenure also undermines her claim.  Simply put, the relatively isolated nature of the two statements, notably not made directly to Plaintiff or in her presence, leaves Plaintiff far short of establishing that the conduct was severe or pervasive enough to constitute a hostile work environment.  *See Adams v. Equinox Holdings, Inc.*, No. 19-CV-8461, 2023 WL 2561508, at *9 (S.D.N.Y. Mar. 17, 2023) ("[T]wo comments alone are not sufficiently continuous and concerted in order to be deemed pervasive." (quotation marks omitted)); *Prude v. Logistics One Trans., Inc.*, No. 20-CV-0674, 2022 WL 4120266, at *8 (N.D.N.Y. Sept. 9, 2022) ("[N]o reasonable jury could find that these isolated comments made by several different coworkers over Prude's three-year employment period were sufficient to alter plaintiff's working conditions and create an abusive working environment."); *Richardson v. Buckheit*, No. 19-CV-8505, 2020 WL 5802291, at *10 (S.D.N.Y. Sept. 29, 2020) (holding that "two false accusations do not amount to allegations of 'severe or pervasive' harassment"); *McGrath v. Thomson Reuters*, No. 10-CV-4944, 2012 WL 2119112, at *15 (S.D.N.Y. Apr. 30, 2012) ("[T]wo stray comments are not sufficiently severe or pervasive to create a hostile work environment."), *report and recommendation adopted by* 2012 WL 2122325 (S.D.N.Y. June 12, 2012), *aff'd*, 537 F. App'x 1

(2d Cir. 2013); *see generally Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (holding

that "the ordinary tribulations of the workplace, such as the sporadic use of abusive language" do

not rise to the level constituting a hostile work environment because civil rights laws do not

enact "a general civility code" (quotation marks omitted)); *Brennan,* 192 F.3d at 318 ("Isolated,

minor acts or occasional episodes do not warrant relief."); *Brown v. Coach Stores, Inc.,* 163 F.3d

706, 713 (2d Cir. 1998) (holding that "despicable and offensive[,]" "racist remarks" made "on

occasion" by a supervisor "fail to constitute discriminatory behavior that is sufficiently severe or

pervasive to cause a hostile environment").

Finally, even if these accusations were sufficiently severe or pervasive to alter the

conditions of the Plaintiff's employment and create an abusive working environment, Plaintiff

has not adduced evidence that such misconduct by co-workers should be imputed to the

employer.  "[T]o hold an employer liable for [] a hostile work environment, federal law requires

the plaintiff to show a specific basis for imputing the conduct creating the hostile work

environment to the employer."  *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90–91 (2d Cir. 2019)

(quotation marks omitted); *see also Lawrence v. Chemprene, Inc.*, No. 18-CV-2537, 2019 WL

5449844, at *9 (S.D.N.Y. Oct. 24, 2019) ("Where the harasser is a non-supervisory coworker,

the employer is not liable for that harassment unless it knew of the conduct and failed to take

appropriate remedial action." (citing *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir.

2015)); *Whidbee*, 223 F.3d at 72.  "Two such bases exist: strict vicarious liability if an

employe[e]'s supervisor has created the hostile environment . . . and negligence if a co-worker

who is not a supervisor has created the hostile environment, and the employer, upon becoming

aware of the misconduct, fails to remedy it."  *Bentley*, 935 F.3d at 91 (internal citations omitted).

Here, Plaintiff has acknowledged that upon becoming aware of the alleged, Mid-Hudson

investigated the underlying facts related to situation and concluded that the accusations against

Plaintiff were without merit.  (Fourth Am. Compl. ¶ 58.)  Moreover, Plaintiff has not alleged that

she had any further trouble with either nurse following these alleged incidents.  (*Id.*)  Therefore,

because Defendants took swift remedial action upon becoming aware of the alleged misconduct,

Plaintiff fails to show that the alleged misconduct by her co-workers should be imputed to her

employer.

Accordingly, the Court grants Defendants summary judgment on the Title VII hostile

work environment claim.

### 2.  Title VII Retaliation

Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against

any of [its] employees . . . because [the employee] has opposed any practice made an unlawful

employment practice by this subchapter[.]"  42 U.S.C. § 2000e-3(a).  In other words, "Title VII

forbids an employer to retaliate against an employee for . . .  complaining of employment

discrimination prohibited by Title VII[.]"  *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461

F.3d 199, 205 (2d Cir. 2006).  Courts analyze claims for retaliation pursuant to Title VII under

the familiar framework set forth by the Supreme Court in *McDonnell Douglas. See Zann Kwan

v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("Federal and state law retaliation claims

are reviewed under the burden-shifting approach of *McDonnell Douglas*[.]").  "Under the first

step of the *McDonnell Douglas* framework, the plaintiff must establish a prima facie case of

retaliation[.]"  *Id*. at 844.  "To make out a prima facie case of retaliation, a plaintiff must

demonstrate that '(1) she engaged in protected activity; (2) the employer was aware of that

activity; (3) the employee suffered a materially adverse action; and (4) there was a causal

connection between the protected activity and that adverse action.'"  *Kelly v. Howard I. Shapiro*

*& Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (italics omitted) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)). "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, non[-]discriminatory reason existed for its action." *Summa v. Hofstra*, 708 F.3d 115, 125 (2d Cir. 2013) (quoting *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)). "If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Id.* (alterations omitted) (quotation marks omitted). "Significantly, a plaintiff alleging retaliation in violation of Title VII must show at the final step of the analysis that retaliation was a but-for cause of the adverse action, not simply a substantial or motivating factor in the employer's decision." *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016) (quotation marks omitted).

"The Supreme Court has held that in the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (quoting *Burlington*, 548 U.S. at 57); *see also Hicks v. Baines*, 593 F.3d 159, 162 (2d Cir. 2010) ("[R]etaliation is unlawful when the retaliatory acts were harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." (quotation marks omitted)). Accordingly, "an action need not affect the terms and conditions of a plaintiff's employment for purposes of a retaliation claim." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 n.6 (2d Cir. 2010). However, the Supreme Court has made clear that even in the retaliation context, "it is important to separate significant from trivial harms." *Burlington*, 548 U.S. at 68.

a.  Simms

Plaintiff appears to claim that Simms told Plaintiff "we are watching you," and that this alleged comment was supposedly made with retaliatory animus.  (Fourth Am. Compl. ¶ 63; Lawson Decl. Ex. B, at 274:17–276:13.)  To establish a prima facie case of retaliation, Plaintiff would have to submit evidence showing that this remark was causally related to some prior protected activity.  Cifra v. G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001) (reciting the requirement in the retaliation context "that a causal connection exists between the protected activity and the adverse action").  A plaintiff can demonstrate the causal connection in one of two ways: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); see also Rodriguez v. Town of Ramapo, 412 F. Supp. 3d 412, 443 (S.D.N.Y. 2019) (same).  Plaintiff testified that the "we are watching you" remark arose from a disagreement about why Plaintiff chose to go home the first day after she returned to work after a year on administrative leave, on a day that she had a migraine headache.  (Lawson Decl. Ex. B, at 273:6–277:16.)  There is no evidence that indicates that the comment is causally related to a protected activity, either temporally or circumstantially, which dooms Plaintiff's claim. Antrobus v. City of New York, No. 19-CV-6277, 2022 WL 4643018, at *7 (E.D.N.Y. Sept. 30, 2022) (dismissing retaliation claim when plaintiff "fails to plead facts suggesting a causal connection to any protected activity"); Harris v. Off. of N.Y.S. Comptroller, No. 20-CV-8827, 2022 WL 814289, at *18 (S.D.N.Y. Mar. 17, 2022) (dismissing retaliation claim when plaintiff "fails to show a causal connection" between a protected activity and an adverse action).

Moreover, Defendants argue that the "we are watching" you remark is not an adverse employment action. (Defs.' Mem. 16.) The Court agrees. This comment, which could be interpreted as subjecting Plaintiff to increased scrutiny, does not qualify as an adverse action. *See Tringone v. N.Y.S. Off. of Mental Health*, No. 18-CV-1896, 2021 WL 5324897, at *9 (E.D.N.Y. Nov. 15, 2021) (holding that retaliation claim could not be predicated on increased scrutiny because "increased monitoring and supervision are not materially adverse as a matter of law"); *Gates v. City of New York*, No. 20-CV-3186, 2021 WL 3774189, at *10 (S.D.N.Y. Aug. 25, 2021) ("[C]ourts have found reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse actions in the retaliation context." (alteration adopted) (citation omitted)); *Workneh v. Pall Corp.*, 897 F. Supp. 2d 121, 134–35 (E.D.N.Y. 2012) (holding scrutiny of plaintiff's job performance was not adverse employment action in the retaliation context); *cf. Eubanks v. N.Y.C. Dep't of Educ.,* No. 18-CV-7877, 2021 WL 1110587, at *15 (S.D.N.Y. Feb. 3, 2021), *report and recommendation adopted by* No. 18-CV-7877, 2021 WL 1105065 (S.D.N.Y. Mar. 23, 2021) (explaining that in the context of a retaliation claim, "[l]etters to [f]ile may constitute adverse actions that would dissuade a reasonable person from complaining of unlawful activity." (quotation marks omitted)).

Next, Plaintiff alleges that, after Plaintiff complained about the "we are watching you" remark to another supervisor, Simms retaliated against Plaintiff a second time by assigning her to monitor P.M.—in contravention of an alleged "policy" against assigning females to monitor males who act in an "open sexual manner." (Defs.' 56.1 ¶ 27–29; Lawson Decl. Ex. B, at 274:17–276:13; Fourth Am. Compl. ¶¶ 64–65.) However, the undisputed evidence demonstrates that Simms gave this assignment to "every SHTA," male and female "that worked on ward 26 when [Plaintiff] was working under her supervision." (Defs.' 56.1 ¶ 30 (alterations adopted).)

Moreover, the alleged policy against assigning female SHTAs to monitor males who act in an open sexual manner does not exist, (Petito-Thorn Decl. ¶ 10), and Plaintiff has presented no evidence to support her contrary allegation.

"[W]here [an] assignment is more than a 'mere inconvenience' and results in a 'material detriment to the employee's working conditions,' *Arroyo-Horne v. City of New York*, No. 16-CV-3857, 2018 WL 4259866, at *11 (E.D.N.Y. Sept. 5, 2018) (quotation marks omitted), or where the assignment is 'demeaning,' *Phillip v. Dep't of Sanitation*, No. 16-CV-2412, 2019 WL 1004588, at *8  (E.D.N.Y. Feb. 28, 2019) , the assignment may qualify as an adverse employment action." *LaFontant,* 2019 WL 1953942, at *8.  However, here, where the assignment is part of Plaintiff's job description—caring for mentally ill patients requiring in-patient care—and, importantly, the assignment was given to *every* male and female SHTA working on P.M.'s ward under Simms' supervision and was not contrary to policy—there is no adverse action.  *See Mineweaser v. City of N. Tonawanda*, No. 14-CV-144, 2016 WL 3352046, at *12 (W.D.N.Y. Mar. 21, 2016), *report and recommendation adopted sub nom. Mineweaser v. City of N. Townawanda*, No. 14-CV-144, 2016 WL 3279574 (W.D.N.Y. June 15, 2016) (holding that plaintiff's assignment to locate an abandoned leaky pipe, "a task that he [did] not dispute fell within his job description and was assigned to other operators," was not an adverse action); *see also Rodas v. Town of Farmington*, 567 F. App'x 24, 27 (2d Cir. 2014) (summary order) (holding no adverse employment action where the plaintiff "conceded that the purportedly degrading work assignments were within his job description"); *Puglisi v. Town of Hempstead Sanitary Dist. No. 2,* No. 11-CV-0445, 2013 WL 6061984, at *6 (E.D.N.Y. Nov. 15, 2013) (noting that if a "work load was increased *unfairly or disproportionately to the other workers*, that could certainly qualify as an adverse action under the standard" (emphasis added) (quotation marks

omitted)); *cf. Feingold v. New York,* 366 F.3d 138, 156 (2d Cir. 2004) (holding adverse

employment action established where the plaintiff, a probationary employee, offered evidence

that his employer acted *contrary to policy* by assigning him a heavier workload than a permanent

employee).[4]

### b.  Nurse Horne and Nurse Musa

To the extent Plaintiff seeks to base a retaliation claim on Nurse Horne's and Nurse

Musa's alleged accusations against Plaintiff with respect to skeletons, voodoo, candles, and

witchcraft, there is no evidence that these nurses' purported accusations were prompted by any

alleged protected activity or that either nurse knew about any alleged protected activity Plaintiff

undertook.  Plaintiff appears to claim that after Musa's accusation against Plaintiff of sleeping on

a camera unit was proven false, Musa started to claim that Plaintiff practices voodoo and placed

---

[4] Even if the assignment could constitute an adverse action, Plaintiff also cannot base a retaliation claim on the allegation that Simms assigned Plaintiff to monitor P.M. in order to punish her for reporting the "we are watching you" remark.  An action is only retaliatory if it is prompted by protected activity, which is defined as "action taken to protest or oppose statutorily prohibited discrimination."  *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (citation omitted).  Here, Plaintiff was not complaining about gender or national origin discrimination when she allegedly reported the "we are watching you" remark.  In her deposition, Plaintiff gave a detailed description of what she said when she complained about Simms' remark, and she never attributed that remark to animus against anyone's gender or national origin.  (Lawson Decl. Ex. B, at 273:6–277:16.)  Rather, Plaintiff reported that the "we are watching you" remark arose from a disagreement about why Plaintiff chose to go home, instead of reporting to hospital duty, on a day that she had a migraine headache. *Id.*

Additionally, even assuming Plaintiff had established a prima facie case, there is a legitimate, nonretaliatory reason that Simms assigned Plaintiff to monitor P.M.—namely that Simms assigned *all* of the employees under her supervision to monitor P.M.  Accordingly, Defendants have demonstrated that a legitimate, non-discriminatory reason for the work assignments existed.  *See Sethi v. Narod,* 12 F. Supp. 3d 505, 547 (E.D.N.Y. 2014) (holding that defendants' actions towards plaintiff were guided by company policy and therefore, constituted a "legitimate reason[] for Plaintiff's treatment").  As Simms assigned all employees to monitor P.M., there is no evidence that Simms' reasons for assigning Plaintiff to monitor P.M. were a pretext for retaliation.

a bone beneath her windshield because Plaintiff is Haitian—there is no mention of a protected

activity. (Pl.'s Decl. ¶ 5.) Accordingly, such a claim cannot stand. *Shargani v. N.Y.C. Dep't of*

*Env't Prote*[*c*]*tion*, No. 21-CV-337, 2022 WL 1046764, at *3 (S.D.N.Y. Apr. 7, 2022)

(dismissing retaliation claim when there was no allegation that defendant "actually knew of his

[protected activity]"); *see also Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015)

(explaining that to state a claim for retaliation, a plaintiff must establish: "(1) participation in a

protected activity; (2) that the defendant knew of the protected activity; (3) an adverse

employment action; and (4) a causal connection between the protected activity and the adverse

employment action." (citation omitted)).[5]

Accordingly, the Court grants Defendant summary judgment on the Title VII retaliation

claim.

---

[5] The Court also notes that Defendants argue that while "Plaintiff makes certain allegations about Mid-Hudson's alleged failure to provide backpay in 2018, [Fourth] Am. Compl. ¶ 53, she does not assert this alleged omission was the product of retaliatory motives (or was related any way to protected activity)." (Defs.'s Mem. 19.) The Court agrees that backpay is mentioned in the Fourth Amended Complaint as a loss that Plaintiff has incurred as a result of the allegedly retaliatory actions, not as retaliation. (Fourth Amend. Compl. ¶¶ 53, 84, 85, 91.) Plaintiff has not argued, nor is there evidence to support the notion that any denial of backpay was causally related to any protected action. Moreover, there is no evidence that Plaintiff asked Mid-Hudson for back pay, indeed Plaintiff testified that she intended to "honor" their agreement not receive backpay. (Lawson Decl. Ex. B, at 260:9–19.)

Defendants additionally argue that any allegations of retaliatory discipline are time-barred. (Defs.' Mem. 14–15.) Plaintiff described the disciplinary incidents in detail in her first EEOC charge, dated August 30, 2017. (*See* Dkt. No. 38-2.) Plaintiff failed to bring a Title VII action within 90 days after she received a right-to-sue letter in response to that charge. *LaFontant*, 2019 WL 1953942, at *6. As this Court has already held, "Plaintiff's 'claims based on facts that formed the basis of the first right-to-sue letter' — that is, those allegations as to Defendants' actions between March 2015 and June 2017 — are time-barred." *Id*. (citation omitted). Even if they were not time-barred, in both instances, Plaintiff was disciplined after an independent Justice Center investigation that substantiated the allegations against Plaintiff and Plaintiff has not demonstrated that Mid-Hudson's stated reasons for disciplining Plaintiff were a pretext for retaliation. "[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006).

### 3.  Equal Protection Retaliation

Retaliation claims under Title VII and §1983 Equal Protection claims are analyzed under the same legal framework.  *See Vega*, 801 F.3d at 82 ("[O]nce the color of state law requirement is met, except for the issue of individual liability, an 'equal protection claim parallels a plaintiff's Title VII claim'. . . . [A] state employee may bring a retaliation claim under § 1983 against a supervisor who, acting under color of law, retaliates against him for opposing discrimination in the terms of his employment." (alteration adopted) (citing *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004))); *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (analyzing Title VII, §1983, and NYSHRL retaliation claims "pursuant to Title VII principles"); *Raymond v. City of New York*, No. 15-CV-6885, 2022 WL 2532467, at *16 (S.D.N.Y. July 7, 2022) (noting that equal protection retaliation claims "are also assessed under the three-step burden-shifting framework set forth in *McDonnell Douglas*"); *Pena-Barrero v. City of New York*, No. 14-CV-9550, 2017 WL 1194477, at *17 (S.D.N.Y. Mar. 30, 2017), ("Retaliation claims brought pursuant to NYSHRL and Sections 1981 and 1983 are treated the same[.]").

Plaintiff asserts that her co-worker, Fabiola Garcon, sent her graphic, sexual images and that Plaintiff thereafter met with Neale to complain about the images.  (Lawson Decl. Ex. B, at 194:3–10.)  Plaintiff testified that Neale "looked at them and he told me to erase them, don't pay attention to them."  (*Id*. at 196:21–23.)  As Plaintiff testified, the photographs were stored on her own personal cell phone, which Neale did not monitor, and it was up to Plaintiff to decide what to do with the photographs once she left Neale's office.  (Lawson Decl. Ex. B, at 198:8–24.)  Plaintiff testified that she forwarded the photos to another coworker, Nonso Williams and then ultimately deleted the images, because she deemed them "too graphic."  (*Id.* at 197:3–98:24.)  To the extent this interaction with Neale can be described as a failure to investigate or take seriously

Plaintiff's complaint, Plaintiff's retaliation claim fails on these grounds because "the failure to investigate a complaint cannot be considered an adverse employment action taken in retaliation for the filing of that same complaint." *Guity v. Uniondale Union Free Sch. Dist.*, No. 15-CV-5693, 2017 WL 9485647, at *25 n.18 (E.D.N.Y. Feb. 23, 2017), *report and recommendation adopted by* 2017 WL 1233846 (E.D.N.Y. Mar. 31, 2017) (citing *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 722 (2d Cir. 2010)); *see also Kelly v. N.Y. State Office of Mental Health*, No. 13 CV 3383, 2016 WL 4203470, at *405 (E.D.N.Y. Aug. 9, 2016) ("[P]laintiff's allegation that defendants failed to investigate her complaints of discrimination on the basis of her alleged disability fails to state an adverse employment action."); *Petyan v. N.Y.C. Law Dep't*, No. 14–CV–1434, 2015 WL 1855961, at *11 (S.D.N.Y. Apr. 23, 2015) ("[F]ailure to properly investigate [plaintiff's] claim does not constitute an adverse employment action.") (collecting cases), *report and recommendation adopted by* 2015 WL 4104841 (S.D.N.Y. July 2, 2015); *Hong Yin v. N. Shore LIJ Health Sys.*, 20 F. Supp. 3d 359, 374 (E.D.N.Y. 2014) (finding, in discrimination context, that "an employer's failure to investigate discrimination claims is not an adverse employment action").[6]

---

[6] Plaintiff also asserts in her Fourth Amended Complaint that she complained to Neale about Schoonmaker's alleged violent threats. (Fourth Am. Compl. ¶ 34; *see also* Defs.' 56.1 ¶ 48.) There is no dispute that Neale did respond to Plaintiff's complaints about Schoonmaker's alleged harassment immediately after he heard about those complaints from James Parker by issuing a staff separation and reported the matter to the Workplace Violence Department. (Defs.' 56.1 ¶¶ 48–50.) Further, Workplace Violence Coordinator Lisa Hendrickson fully investigated the matter and issued a report of her findings. (*Id.* ¶¶ 50–52.)

Plaintiff also testified that she heard from another employee that Neale called her "an enemy of the state" because she had reported physical harassment to the police. (Lawson Decl. Ex. A, at 234:1–25; 238:8–19 (Dkt. No. 117).) This is not an adverse action. *See Brand v. New Rochelle City Sch. Dist.,* No. 19-CV-7263, 2022 WL 671077, at *14 (S.D.N.Y. Mar. 7, 2022) ("Menacing looks, name calling, or being shunned by co-workers does not constitute an adverse employment action [in the retaliation context]." (citation omitted)); *Esar v. JP Morgan Chase Bank N.A.*, No. 15-CV-382, 2018 WL 2075421, at *13 (E.D.N.Y. May 3, 2018) (holding stray remark about plaintiff did not qualify as adverse action); *De La Rosa v. N.Y.C. Police Dep't*, No.

To the extent that Plaintiff seeks to hold Neale personally liable for the first alleged act of retaliatory discipline—i.e., the decision to discipline Plaintiff for slapping a patient, such a claim cannot stand.  "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Sterling v. Akinyombo*, No. 20-CV-10804, 2022 WL 2657223, at \*4 (S.D.N.Y. July 8, 2022) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).  "[A] plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quotation marks omitted); *see also Leneau v. Ponte*, No. 16-CV-776, 2018 WL 566456, at \*15 (S.D.N.Y. Jan. 25, 2018) (dismissing allegations against a defendant for lack of personal involvement because the "[p]laintiff's general allegation that all defendants were involved in the alleged constitutional violations does not rescue the claims against" a particular defendant).  Accordingly, "a plaintiff may not rely on a special test for supervisory liability" instead, "[t]he violation must be established against the supervisory official directly."  *Tangreti*, 983 F.3d 616–18.

The undisputed evidence shows that Neale was not the person who reported the slapping incident.  (*See, e.g.,* Fourth Am. Compl. ¶ 42; Neale Decl. ¶¶ 7–8.)  Neale also played no role in investigating that incident.  (Neale Decl. ¶¶ 7–9.)  Rather, the Justice Center investigated the matter, and it did so independently.  (*Id.*; *see also* Lawson Decl. Ex. G at 35:9–23; 37:19–24.)  Moreover, it was the Justice Center—and not Neale—that determined that the evidence

---

09-CV-5290, 2010 WL 4177626, at \*11 (S.D.N.Y. Oct. 22, 2010) ("As for the allegations of name calling and derogatory remarks, such comments also do not constitute an adverse change in employment. 'While verbal abuse might at times be sufficiently severe and chronic to constitute an adverse employment action, such behavior, without more, hardly rises to the level of actionable retaliation.'" (citation omitted)).

supported the allegations against Plaintiff.  (*See* Mendez Decl. Ex. C; N.Y. Soc. Serv. Law §

493(3) (requiring the Justice Center to determine whether the "alleged abuse or neglect is

substantiated").)  Finally, the Notice of Discipline instituting disciplinary charges against

Plaintiff was drawn up at the request of the Bureau of Employee Relations at the State Office of

Mental Health—and not Neale.  (Mendez Decl. ¶¶ 16–17; Neale Decl. ¶ 12.)  Neale had no input

into the question of whether Plaintiff should be disciplined, or what penalty should be imposed.

(Neale Decl. ¶ 12; Mendez. Decl. ¶ 21.)[7]  Accordingly, as Plaintiff has not demonstrated Neale's

personal involvement in the first alleged act of retaliatory discipline, Plaintiff's claim against him

on that basis must fail.  *Lewis v. City of New York*, No. 07-CV-7258, 2010 WL 2836112, at *4

---

[7] On May 2, 2019, the Court dismissed the discrimination claim against Neale that had
been asserted in Plaintiff's Second Amended Complaint because Plaintiff failed to allege that
Neale acted with discriminatory intent or purpose.  *Lafontant*, 2019 WL 1953942, at *10.
Plaintiff thereafter elected to drop her discrimination claim against Neale (including allegations
relating to the alleged hostile work environment) and to proceed against Neale solely on a
retaliation theory. (Lawson Decl. ¶¶ 2–5, *Id.* at Ex. A.)  However, Plaintiff's efforts to delete
references to the former claim from amended versions of her pleading were not entirely
successful.  For example, a bolded heading referencing alleged "discriminatory" acts by Neale
still exists in Plaintiff's current pleading. (*See* Fourth Am. Compl. at 23.)  While the Court does
not construe the Fourth Amended Complaint to allege a discrimination or hostile work
environment claim against Neale, as Plaintiff confirmed that she did not intend to pursue such
claims, if the Fourth Amended Complaint were construed to allege such claims, such claims
would fail for the reasons set forth in the Court's decision granting the motions to dismiss.

Additionally, while Plaintiff does not list New York State Human Rights Law as a cause
of action, in paragraph three of the Fourth Amended Complaint, Plaintiff notes that it can
maintain a New York State Human Rights Law claim against Neale. (Fourth Am. Compl. ¶ 3.)
While the Court does not read the Fourth Amended Complaint, which was drafted by an
attorney, to state a New York State Human Rights Law claim against Neale, as the federal causes
of action have been dismissed, this Court would not exercise supplemental jurisdiction over a
state cause of action here.  Federal district courts have supplemental jurisdiction over state law
claims "that are so related to claims in the action within such original jurisdiction that they form
part of the same case or controversy under Article III of the United States Constitution."  28
U.S.C. § 1367(a).  However, such jurisdiction is discretionary, *see City of Chicago v. Int'l Coll.
of Surgeons*, 522 U.S. 156, 173 (1997), and a district court "may decline to exercise
supplemental jurisdiction" if the court "has dismissed all claims over which it has original
jurisdiction," 28 U.S.C. § 1367(c)(3).

(S.D.N.Y. June 29, 2010) ("[T]he burden is on a plaintiff to present sufficient evidence to demonstrate the personal involvement of each of the defendants, and it has been recognized that a defendant's motion for summary judgment must be granted in the absence of such evidence.") (quotation marks omitted); *Taylor v. Santana*, No. 05-CV-1860, 2007 WL 737485, at *7 (S.D.N.Y. Mar. 6, 2007) ("Defendants' personal involvement is an essential element of a § 1983 claim, which plaintiff would bear the burden of proving at trial. . . .  Because plaintiff has failed to make the requisite showing, summary judgment in favor of defendants is appropriate."), *aff'd sub nom. Taylor v. Comm'r of New York City Dep't of Corr.*, 317 F. App'x 80 (2d Cir. 2009) (summary order).

Accordingly, the Court grants Defendant summary judgment on the Equal Protection retaliation claim.

### 4.  Plaintiff's New Allegations

Plaintiff has submitted eight exhibits, all of which consist of emails or other statements authored by Plaintiff, with her opposition papers.  (*See* Pl.'s Decl. Exs. A–H.)  The exhibits do not address Plaintiff's existing allegations but instead attempt to raise new allegations that were never pleaded in the Complaint. "A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion."  *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-CV-10452, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004); *Com. Tenant Servs., Inc. v. Penske Bus. Media, LLC,* No. 20-CV-9756, 2022 WL 4292971, at *5 (S.D.N.Y. Sept. 16, 2022) (same); *see also Avillan v. Donahue*, 483 F. App'x. 637, 639 (2d Cir. 2012) (summary order) (holding that the "district court did not err in disregarding allegations [*pro se* plaintiff] raised for the first time in response to [defendant's] summary judgment motion").

In the same vein, Plaintiff argues in opposition to summary judgment that she "experienced illegal retaliation and defamation of character." (Pl.'s Mem. 1.) Insofar as Plaintiff seeks to allege a defamation cause of action, she cannot amend her Complaint by adding claims in her opposition to summary judgment. *See Lombardo v. Dr. Seuss Enters., L.P.,* No. 16-CV-9974, 2017 WL 1378413, at *4 (S.D.N.Y. Apr. 7, 2017) (noting that when "the phrases defamation . . . appear[ed] nowhere in the [c]omplaint" it was not "proper for plaintiffs to have asserted these new legal theories in their opposition brief").

### III.  Conclusion

For the foregoing reasons, Defendants' Motion is granted. The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 90), enter judgment for Defendants, mail a copy of this Opinion & Order to Plaintiff at the address listed on the docket, and close this case.

SO ORDERED.

Dated:   October 10, 2023
         White Plains, New York

_____
        KENNETH M. KARAS
        United States District Judge